10-5258-cv
*Mastafa v. Chevron Corp.*

# In the
# United States Courts of Appeals
# For the Second Circuit

————

AUGUST TERM 2013
No. 10-5258-cv

SAADYA MASTAFA, KAFIA ISMAIL, BATUL NUR,
AFAF RASOOL, ZAHRA RASOOL,
*Plaintiffs-Appellants,*

*v.*

CHEVRON CORPORAION, BANQUE NATIONALE DE PARIS PARIBAS,
*Defendants-Appellees,*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 10-cv-5646—Jed S. Rakoff, *Judge.*

————

SUBMITTED: MAY 28, 2014
DECIDED: OCTOBER 23 , 2014

————

Before: CABRANES, STRAUB, and LIVINGSTON, *Circuit Judges.*

————

The question presented is whether the United States District Court for the Southern District of New York (Jed. S. Rakoff, *Judge*) properly dismissed the complaint of five Iraqi nationals who claim that they or their family members were tortured, imprisoned, and in some cases executed by the regime of Saddam Hussein. Plaintiffs filed suit in July 2010 against defendants Chevron Corp. and Banque Nationale de Paris Paribas (jointly, "defendants"), alleging that defendants illicitly diverted money to the Saddam Hussein regime—then subject to economic sanctions—in violation of customary international law. Plaintiffs contend on appeal that such harms are cognizable under the Alien Tort Statute of 1789 ("ATS"), 28 U.S.C. § 1350, which establishes district court jurisdiction "of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States," as well as the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note, and New York common law.

The parties agree, and we hold, that the Supreme Court's decision in *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012), indisputably forecloses plaintiffs' claims brought under the TVPA. We also conclude, in a question of first impression for this Court, that we do not have jurisdiction over plaintiffs' ATS claims pursuant to the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), and our holding in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009). Accordingly, we AFFIRM the judgment of the District Court.

———

John T. Murray, Murray & Murray Co., L.P.A., Sandusky, Ohio, *for Plaintiffs-Appellants*.

Meir Feder, Thomas E. Lynch, Jones Day, New York, NY; Gregory G. Katsas, Michael A. Carvin, Jones Day, Washington, D.C., *for Defendant-Appellee Chevron Corp.*

Robert S. Bennett, Ellen Kennedy, Hogan Lovells US LLP, Washington, D.C.; Jennifer L. Spaziano, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C., *for Defendant-Appellee Banque Nationale de Paris Paribas.*

Terrence Patrick Collingsworth, Conrad & Scherer, LLP, Washington, D.C., *for amicus curiae Human Rights Watch and Labor Organizations.*

————

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented is whether the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) properly dismissed the complaint of five Iraqi nationals who claim that they and their family members were tortured, imprisoned, and in some cases executed, by the Saddam Hussein regime. Plaintiffs filed suit in July 2010 against defendants Chevron Corp. and Banque Nationale de Paris Paribas ("BNP") (jointly, "defendants"), alleging that defendants illicitly diverted money to the Saddam Hussein regime—then subject to economic sanctions—in violation of customary international law. Plaintiffs contend on appeal that such

harms are cognizable under the Alien Tort Statute of 1789 ("ATS"), 28 U.S.C. § 1350, which establishes district court jurisdiction "of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States," as well as the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note, and New York common law. The District Court entered judgment on November 30, 2010, dismissing plaintiffs' complaint with prejudice under Federal Rules of Civil Procedure 12(b)(1) and (6).

The parties agree, and we hold, that the Supreme Court's decision in *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012), indisputably forecloses plaintiffs' claims brought under the TVPA. We also conclude, in a question of first impression for this Court, that we do not have jurisdiction over plaintiffs' ATS claims pursuant to the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), and our holding in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009). Accordingly, we AFFIRM the judgment of the District Court.

**BACKGROUND**

**I.     The Complaint**

Plaintiffs in this action are Iraqi women who were the victims of torture by agents of the Saddam Hussein regime or whose husbands were the victims of such torture. Two plaintiffs are Kurdish women currently living in Iraq, and the remaining three

plaintiffs were citizens of Iraq at the time of the alleged torture but are now either citizens or permanent residents of the United States.[1] Plaintiffs filed the instant case on July 26, 2010, seeking, *inter alia*, compensatory and punitive damages on their own behalf and as a putative class action on behalf of those similarly situated. They claim that the defendant corporations aided and abetted the abuses of the Saddam Hussein regime by paying the regime kickbacks and other unlawful payments, which enabled the regime to survive and perpetrate the abuses suffered by plaintiffs or their husbands.

The allegations against defendants stem from the United Nations' Oil for Food Programme ("OFP"). The OFP "permitted the export of oil from Iraq in exchange for food, medicine, and other basic civilian necessities" by allowing the purchase of Iraqi oil to proceed through an escrow account, into which purchasers submitted payments and from which providers of civilian necessities received payment. *Mastafa v. Chevron Corp.*, 759 F. Supp. 2d 297, 298-99 (S.D.N.Y. 2010). Plaintiffs allege that the Saddam Hussein regime—then subject to United Nations economic sanctions—misused the OFP in order to "[e]licit income outside the United Nation[s'] oversight and fund its regime . . . . [and] to fund its campaign of human rights abuses against its people." Compl.

---

[1] The ATS is unusual in that it confers upon "aliens" a cause of action in U.S. courts. The fact that two of the plaintiffs are now U.S. citizens raises the question whether they have statutory standing to assert a cause of action under the ATS. Because neither party has addressed this question, we assume without deciding for purposes of this opinion that these particular U.S. citizen plaintiffs, who were "aliens" at the time of the alleged violations at issue, may bring an action under the ATS.

¶¶ 33-34.

The misuse occurred when the Iraqi regime began imposing illegal "surcharges" of 10 to 30 cents per barrel on oil being lawfully sold by Iraq pursuant to the OFP. The complaint alleges that this surcharge was known to all "contracting customers" of the Saddam Hussein regime, including Chevron—which is alleged to have knowingly paid the illegal surcharge on 9,533,690 barrels of oil. *Id.* ¶¶ 37-41. The complaint alleges that Chevron "acted as a financer to many . . . oil contracts," *id.* ¶ 58, and that, in doing so, Chevron "made surcharge payments, facilitated surcharge payments and participated in surcharge payments in order to purchase oil from Iraq through the [OFP]," *id.* ¶ 72. Chevron allegedly "paid $20 million in [illicit] surcharge payments . . . through third parties," and "knew that the premiums it paid to the third party were passed through to the Saddam Hussein regime as a requirement to purchase oil." *Id.* ¶¶ 83-84.

With respect to BNP, the complaint alleges that, pursuant to a Banking Agreement between BNP and the United Nations, BNP was the sole escrow bank for the OFP and was responsible for policing financial transactions associated with it. Under the Banking Agreement, one of BNP's roles as escrow agent for the United Nations was to ensure that financial transactions were in compliance with the United Nations Security Council resolutions that had created the program. Plaintiffs assert that, notwithstanding this obligation under the Banking Agreement, "BNP knew that the true nature of the financial transactions included illicit payments to the

[Saddam Hussein] Regime and failed to disclose or interrupt the payments*." Id.* ¶ 107. Plaintiffs further allege that "[s]ome of the surcharges were paid by BNP through customer accounts*," id.* ¶ 70, and that in at least one transaction, BNP "hid the identity of oil financiers as participants in an oil transaction" in violation of the Banking Agreement, *id.* ¶ 125.

There is no allegation by plaintiffs that Chevron or BNP, or their employees, directly engaged in the human rights abuses allegedly committed by the Saddam Hussein regime. Rather, plaintiffs allege that "[t]hese surcharge payments financed the torture" and other atrocities inflicted on them or their husbands, which required considerable funding*. Id.* ¶ 45. Plaintiffs contend that, through these alleged exploitations of the OFP, Chevron and BNP aided and abetted the Saddam Hussein regime's abuses, and that their claims are therefore actionable under the ATS and the TVPA.

## II.  Procedural History

On November 30, 2010, the District Court entered judgment dismissing plaintiffs' complaint with prejudice. The dismissal was based on the District Court's conclusions that (1) the ATS claims were barred by the Second Circuit's opinion in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), which held that the ATS does not confer jurisdiction for claims alleging violations of the "law

of nations" (that is, customary international law[2]) against corporate defendants; (2) plaintiffs had failed adequately to plead negligence under state law, and other state law claims were time-barred; and (3) there were various pleading deficiencies in their TVPA claim.

Plaintiffs timely appealed, and filed their initial briefs in this appeal between April and July 2011. Plaintiffs initially asserted a number of arguments, including that the ATS and TVPA allowed for corporate liability, that claims could be brought against alleged "aiders and abettors" under the TVPA, and that they had met other pleading requirements necessary to state a claim under the TVPA.

After the Supreme Court granted *certiorari* in *Kiobel*, 132 S. Ct. 472 (2011), plaintiffs here moved on October 21, 2011, to stay the appeal pending the Supreme Court's adjudication of the case. We granted the motion on October 25, 2011.

---

[2] *See, e.g., Kiobel*, 621 F.3d at 116 (describing ATS jurisdiction over "violations of the law of nations (also called 'customary international law')"); *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 116 (2d Cir. 2008) (noting that "[i]n the broader context" beyond ATS litigation, "the law of nations has become synonymous with the term 'customary international law'"); *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 237 n.2 (2d Cir. 2003) ("In the context of the [ATS], we have consistently used the term 'customary international law' as a synonym for the term the 'law of nations.'"); *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980) (considering sources of "customary international law" in determining that "official torture is now prohibited by the law of nations"); *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (Scalia, J., dissenting in part) (using the terms interchangeably when noting that "'the law of nations' or customary international law, includes limitations on a nation's exercise of its jurisdiction to prescribe").

Following oral argument in *Kiobel*, the Supreme Court, on March 5, 2012, ordered supplemental briefing and reargument on "[w]hether and under what circumstances the Alien Tort Statute . . . allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." 132 S. Ct. 1738 (2012) (internal quotation marks omitted). In April 2013, the Supreme Court issued its decision in *Kiobel*, 133 S. Ct. 1659 (2013), holding that "the presumption against extraterritoriality applies to claims under the ATS . . . and case[s] seeking relief for violations of the law of nations occurring outside the United States [are] barred." *Id*. at 1669. It did not address, much less question or modify, the holding on corporate liability under the ATS that had formed the central conclusion in the Second Circuit's *Kiobel* opinion.

Additionally, during the pendency of the stay here, the Supreme Court decided another case with direct relevance to this action. In *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012), the Court held that the TVPA "authorizes liability solely against natural persons," *id*. at 1708, and "does not impose liability against organizations," including corporations, *id*. at 1705.

On March 28, 2014, we vacated the stay of this appeal, and ordered supplemental letter briefs from the parties on the effect, if any, of the Supreme Court's decisions in *Kiobel* and *Mohamad*.

The supplemental briefing having been completed, we now conclude that the District Court properly dismissed the claims brought pursuant to the TVPA and ATS.[3]

## DISCUSSION

In reviewing a district court's determination of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), we review legal conclusions *de novo* and factual findings for clear error. *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id*.

We review *de novo* a district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), accepting all factual allegations in the complaint as true. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[3] Plaintiffs did not challenge the District Court's dismissal of claims brought pursuant to New York law in their initial appellate briefs, nor in their supplemental letter brief. Accordingly, the dismissal of those claims is not addressed here or disturbed in any way by this decision.

plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks omitted). "Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (alterations omitted).

## I.      The TVPA Claims

The TVPA imposes liability on "[a]n *individual* who, under actual or apparent authority, or color of law, of any foreign nation" subjects another individual to torture or extrajudicial killing. 28 U.S.C. § 1350 note § (2)(a) (emphasis supplied). Plaintiffs in *Mohamad* argued that the word "individual" in the statute encompassed both natural persons and "nonsovereign organizations," including the political organization that was the defendant in that action. *Mohamad*, 132 S. Ct. at 1706. The Supreme Court disagreed, holding that the term "individual" in the TVPA "authorizes suit against natural persons alone." *Id*. The Court also expressly stated that the statute does not provide for suits against corporate entities, noting that "it is the rare statute . . . in which Congress expressly defines 'individual' to include corporate entities," and that "[t]here are no such indications in the TVPA." *Id*. at 1707.

There is no dispute that the defendants in this action are corporations, and therefore we are required to hold that they are not subject to liability under the TVPA. Plaintiffs acknowledge this point, conceding in their supplemental brief that "Chevron and BNP cannot be liable pursuant to the TVPA under the current state of the law." Appellants' Ltr. Br. 2. Accordingly, we affirm the Rule 12(b)(6) dismissal of the claims brought pursuant to the TVPA.

## II.    The ATS Claims

The ATS states, in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. It is a "jurisdictional" statute in the sense that it "address[es] the power of the courts to entertain cases concerned with a certain subject." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004). Although it reads as a "jurisdictional grant" only, the Supreme Court has held that the ATS was "enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Id.* at 724. As Judge Friendly has explained, the ATS's "reference to the law of nations must be narrowly read if the section is to be kept within the confines of Article III." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975) (Friendly, J.), *abrogated on other grounds*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). Thus, although there are billions of people in the world residing under various forms of state-sponsored oppression, claims are only actionable under the ATS if they are

"accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" upon which the ATS was written in 1789. *Sosa*, 542 U.S. at 725.[4]

Defendants assert numerous grounds upon which we might affirm the dismissal of plaintiffs' ATS claims, including that (1) defendants are corporations, and therefore not subject to ATS liability pursuant to the Second Circuit's holding in *Kiobel*; (2) plaintiffs have failed to state a claim for aiding and abetting violations of the law of nations; and (3) the Supreme Court's decision in *Kiobel* forecloses our jurisdiction over cases such as this one, where the claims do not sufficiently "touch and concern" the United States. *See* Chevron's Ltr. Br.; BNP's Ltr. Br.

It is natural for us to begin with the question of our subject-matter jurisdiction, which "functions as a restriction on federal power." *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). "'Without jurisdiction the court cannot proceed at all in any cause'; it may not assume jurisdiction for the purpose of deciding the merits of the case." *Sinochem Int'l Co. v.*

---

[4] *See generally Freedom in the World Country Ratings (2014)*, Freedom House, *available at* http://www.freedomhouse.org/sites/default/files/Country%20Status%20% 26%20Ratings%20Overview%2C%201973-2014.pdf (asserting that in 2014, only 45% of countries in the world were characterized as "free," while 30% were "partly free" and 24% were "not free"). Those living in countries characterized as "not free" generally have very restricted or no civil liberties, including very limited or no freedom of expression or association, and very restricted or no political rights, and thus likely suffer numerous depredations, not all of which are actionable under customary international law (or "the law of nations"). *See* Freedom House, Ratings and Status Characteristics, http://www.freedomhouse.org/report/freedom-world2014/methodology#.U_4Oq8VdWR (last visited Aug. 27, 2014).

*Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Indeed, "[b]ecause of the primacy of jurisdiction, 'jurisdictional questions ordinarily must precede merits determinations in dispositional order.'" *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 397 (2d Cir. 2009) (quoting *Sinochem*, 549 U.S. at 431); *see also Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185, 1188 (11th Cir. 2014) (addressing the question of jurisdiction under the ATS, rather than the substantive question that had been certified, because, "no matter how a case comes before us, the court has the authority and the duty to determine its own jurisdiction").

Here, then, we begin by assessing whether the ATS grants us jurisdiction over plaintiffs' action. In light of the singular character of the ATS as a jurisdictional statute that derives its substantive meaning from customary international law, there are numerous jurisdictional predicates, all of which must be met before a court may properly assume jurisdiction over an ATS claim. For a district court, these jurisdictional inquiries include, but may not be limited to, a determination that: (1) the complaint pleads a violation of the law of nations, *see Sosa*, 542 U.S. at 732; *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995); (2) the presumption against the extraterritorial application of the ATS, announced by the Supreme Court in *Kiobel*, 133 S. Ct. 1659, does not bar the claim; (3) customary international law recognizes liability for the defendant, *see Kiobel*, 621 F.3d at 145; and (4) the theory of liability alleged by plaintiffs (*i.e.*, aiding and abetting, conspiracy) is recognized by customary international law, *see Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254, 264 (2d Cir. 2007) (Katzmann, J., concurring). Although each of these requires an

affirmative determination before a court properly has jurisdiction over an ATS claim, the order and manner in which a court undertakes these inquiries is a matter of discretion based upon the particular circumstances presented. Here, in the circumstances before us, we begin with an inquiry into whether plaintiffs pleaded a violation of the law of nations, we then examine the theory of liability asserted, and we finally address extraterritoriality. Because we conclude that the complaint is barred by the presumption against extraterritoriality, we need not conclusively address other jurisdictional predicates.[5]

### A.    Pleading a Violation of the Law of Nations

The first jurisdictional inquiry that we undertake is determining whether plaintiffs have adequately pleaded a cause of action. The ATS only confers jurisdiction over torts based upon violations of United States treaties or of the law of nations. 28 U.S.C. § 1350. As Judge Jon O. Newman has explained, "[b]ecause the [ATS] requires that plaintiffs plead a violation of the law of nations

---

[5] We note that the District Court dismissed all of plaintiffs' ATS claims from the bench "because of the decision of the Second Circuit in *Kiobel*," App'x 58, referring to our *Kiobel* opinion, in which we held that "[b]ecause corporate liability is not recognized as a specific, universal, and obligatory norm . . . it is not a rule of customary international law that we may apply under the ATS." 621 F.3d at 145 (internal quotation marks and citation omitted). Although the holding of our *Kiobel* opinion has not been modified or disturbed, *see Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 49 n.6 (2d Cir. 2014); *Balintulo v. Daimler AG*, 727 F.3d 174, 191 n.26 (2d Cir. 2013), plaintiffs argue in their supplemental brief that we should reevaluate the holding of our *Kiobel* opinion. *See* Appellants' Ltr. Br. 2-3. As it happens, we have no need to address that argument because we dispose of plaintiffs' claims on other jurisdictional grounds.

at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible 'arising under' formula of [28 U.S.C.] section 1331." *Kadic*, 70 F.3d at 238 (internal quotation marks omitted). "Thus, it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations. There is no federal subject-matter jurisdiction under the [ATS] unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States)." *Id*.

Plaintiffs' complaint asserts seven causes of action predicated upon the following alleged violations by the Saddam Hussein regime: (1) crimes against humanity; (2) war crimes; (3) genocide; (4) torture; (5) extrajudicial killings; (6) forced disappearances of persons; and (7) cruel, inhuman, and/or degrading treatment and/or punishment. *See* App'x 34-43. All of these claims, plaintiffs argue, are cognizable under the ATS as torts committed in violation of the law of nations or of United States treaties. *See id*. at 28-29 ¶ 158.

Violations of the law of nations, also known as customary international law,[6] are those "violations of . . . international law norm[s] with [as] definite content and acceptance among civilized nations [as] the historical paradigms familiar when [the ATS] was enacted [in 1789]," *Sosa*, 542 U.S. at 732, or, in other words, are violations of "specific and universally accepted rules that the nations of the world treat as binding *in their dealings with one another*," *Kiobel*, 621 F.3d at 118. We do well to recall that customary international law, as Judge Friendly explained, addresses only those

---

[6] *See* note 2, *ante*.

wrongs proscribed by "standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings *inter se*." *IIT v. Vencap, Ltd.*, 519 F.2d at 1015; *see also Flores*, 414 F.3d at 249; n.23, *post*, and accompanying text. By way of example, Judge Friendly rejected the notion that "the Eighth Commandment 'Thou shalt not steal' is part of the law of nations," because, "[w]hile every civilized nation doubtless has this as a part of its legal system," that is insufficient to establish it as a norm of the law of nations; rather, it must affect the relationship between states or between an individual and a foreign state, and must relate to the practice of states in their relationships *inter se*. *Vencap*, 519 F.2d at 1015; *see also Flores*, 414 F.3d at 249 ("[F]or example, murder of one private party by another, universally proscribed by the domestic law of all countries (subject to varying definitions), is not actionable under the AT[S] as a violation of customary international law because the nations of the world have not demonstrated that this wrong is of mutual, and not merely several, concern." (internal quotation marks omitted)).

We conclude that plaintiffs have satisfied their burden of asserting some causes of action grounded in actions recognized as violations of customary international law. *See, e.g., Presbyterian Church*, 582 F.3d at 256 (acknowledging that genocide, war crimes,

and crimes against humanity may be asserted as causes of action under the ATS).[7]

## B.      The Theory of Liability Asserted

Plaintiffs here bring claims under both an aiding and abetting and a conspiracy theory of liability. We have held that "in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the AT[S]," *Khulumani*, 504 F.3d at 260, and accordingly, plaintiffs have pleaded a theory of liability over which we have subject matter jurisdiction.

---

[7] Plaintiffs also allege causes of action for torture; extrajudicial killing; forced disappearances of persons; and cruel, inhuman, and/or degrading treatment and/or punishment. Were these the only causes of action alleged, we would remand to the District Court for a determination in the first instance of whether they constitute violations of customary international law. However, because plaintiffs have pleaded three causes of action that unquestionably allege violations of customary international law—war crimes, genocide, and other crimes against humanity—they have satisfied this jurisdictional predicate. As we ultimately conclude that the claim is barred as a jurisdictional matter by the presumption against extraterritoriality, *see* Section II.C.5, *post*, we need not remand this question to the District Court.

Accordingly, we intimate no view on whether these in fact are violations of the law of nations, nor on other corollary questions that would need be answered in order to make such a determination, including whether the TVPA, enacted in 1991, now provides the sole means by which plaintiffs can bring claims based upon torture and extrajudicial killing. *See Enahoro v. Abubakar*, 408 F.3d 877, 884-85 (7th Cir. 2005) (concluding that in enacting the TVPA, Congress established it as the sole means through which a plaintiff could allege claims for extrajudicial killing and torture, because "[i]f it did not, it would be meaningless. No one would plead a cause of action under the TVPA and subject himself to its requirements if he could simply plead under" the ATS); *cf. Filartiga*, 630 F.2d at 880 (holding, well before the TVPA was passed, that "an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations").

Whether there is conspiracy liability under customary international law and hence under the ATS remains an open question in this Circuit. *See Presbyterian Church*, 582 F.3d at 260 (assuming without deciding that a conspiracy theory in the form of a "joint criminal enterprise" is cognizable under the ATS). Because we ultimately dispose of these claims on jurisdictional grounds other than whether conspiracy liability is available under the ATS, *see* Section II.C.5, *post,* we need not address that question here.

### C.    Displacing the Presumption Against Extraterritoriality

Having held that the complaint alleges violations of the law of nations, we now turn to the question of whether the presumption against the extraterritorial application of statutes bars plaintiffs' action.

### 1.  The Supreme Court's Opinion in *Kiobel*

The Supreme Court's opinion in *Kiobel*, 133 S. Ct. 1659, significantly clarified the jurisdictional grant of the ATS with respect to extraterritoriality, and we therefore begin our jurisdictional analysis with an examination of that case.

The Supreme Court concluded in *Kiobel* that "[t]he principles underlying the presumption against extraterritoriality . . . constrain courts exercising their power under the ATS." 133 S. Ct. at 1665. The Court reached this conclusion after examining the statutory text and historical setting of the ATS's passage, seeking evidence of congressional intent that it apply extraterritorially, *id*. at 1665-69, but determining that "there is no clear indication of extraterritoriality

here," *id*. (internal quotation marks and alteration omitted). Accordingly, the Court held that the ATS could not form the basis for jurisdiction of U.S. courts over acts occurring entirely beyond the territory of the United States. *Id.*

At the end of its opinion, the Supreme Court held that, in the specific case before it, the ATS could not confer federal jurisdiction over plaintiff's claims because "all the relevant conduct took place outside the United States." *Id*. at 1669. Then, in language that has become the subject of interest by scholars and lower courts, the Court appeared to leave open a window for ATS actions that are based in part on extraterritorial conduct. The Court added:

> And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. *See Morrison*, 561 U.S. [247], 130 S. Ct. [2869,] 2883–2888. Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices.

*Id*. at 1669.

An evaluation of the presumption's application to a particular case is essentially an inquiry into whether the domestic contacts are sufficient to avoid triggering the presumption at all. The presumption was not "displaced" in *Kiobel* because all of the relevant conduct alleged in that suit took place outside of U.S. territory. Yet, as the Supreme Court had previously recognized, it will often be the case that "th[e] presumption . . . is not self-

evidently dispositive, but its application requires further analysis." *Morrison*, 561 U.S. at 266. As the Court noted in *Morrison*, "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." *Id*.

Indeed, in the instant action, the complaint includes some "contact" between the injuries alleged and the territory of the United States. Although the depredations of the Saddam Hussein regime undeniably occurred outside of the United States, plaintiffs argue that the abuses they allegedly suffered at the hands of the Saddam Hussein regime "flow from financial transactions within the territory of the United States." Appellants' Ltr. Br. 4. In particular, plaintiffs point to the following allegations: (1) the OFP was created, administered, and its contracts approved by the United Nations in New York City, where the United Nations headquarters is located; (2) Chevron is headquartered in the United States, which means that many decisions related to the alleged violations of the OFP were "necessarily made by the top stake holders at Chevron in the United States"; (3) Chevron engaged in transactions with other U.S. companies involving the OFP oil and illicit surcharges, and its "profits reaped from the transactions were recouped in the United States"; and (4) BNP entered into a Banking Agreement with the United Nations in New York pursuant to which it maintained an

escrow account in New York City through which all OFP funds moved, including the illicit surcharge payments. *Id*. at 4-5.[8]

In light of the "connections" to U.S. territory asserted in the complaint, the presumption against extraterritorial application is not "self-evidently dispositive" here, as it was in *Kiobel*, and our jurisdictional inquiry requires the "further analysis" envisaged in *Morrison*. What type of further analysis is required, and what facts are relevant to determining whether a claim sufficiently "touches and concerns" the United States so as to *displace* the presumption against extraterritorial application in the context of the ATS is a question of first impression for our Court. However, we draw considerable guidance from the teachings of the Supreme Court in several cases, in particular, from *Morrison*.[9]

---

[8] Whether conduct occurring within the United Nations Headquarters in New York City constitutes domestic or extraterritorial conduct for purposes of our jurisdictional inquiry is a novel question. Pursuant to the relevant agreement between the United States and United Nations, the United Nations "headquarters district," including the Headquarters building, has been afforded a unique status. *See* Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, *reprinted at* 22 U.S.C. § 287 historical note ("U.N. Headquarters Agreement"). Nonetheless, conduct occurring within the headquarters district is subject to the same jurisdictional analysis as if such conduct occurred anywhere else in New York City. We so conclude based upon the agreement's provision that "the federal, state and local courts of the United States shall have jurisdiction over acts done and transactions taking place in the headquarters district as provided in applicable federal, state and local laws." U.N. Headquarters Agreement § 7(c). Therefore, conduct that occurred within the United Nations Headquarters will be treated as domestic conduct for purposes of the jurisdictional analysis under the ATS.

[9] At the outset of our analysis, we acknowledge (as did the Supreme Court in *Kiobel*, 133 S. Ct. at 1664) that the presumption against the extraterritoriality of statutes has typically been applied to substantive statutes that regulate conduct, rather than

### 2. *Morrison's* "Focus" Analysis

To determine how to undertake the extraterritoriality analysis where plaintiffs allege some "connections" to the United States, we first look to the Court's opinion in *Morrison*, in which the Court actually engaged in the required "further analysis" with respect to § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). After determining that the presumption against extraterritorial effect of statutes applied to the Exchange Act, the Court then sought to determine which "territorial event[s]" or "relationship[s]" were the "focus" of the Exchange Act. *Morrison*, 561 U.S. at 266. The Court determined that the "focus" of the statute was on "purchases and sales of securities in the United States," rather than "the place where the deception originated." *Id*. Analyzing transactions of securities not registered on domestic exchanges, the Court again noted that "it is the foreign location of the *transaction* that establishes (or reflects the presumption of) the Act's inapplicability." *Id*. at 268. In light of Congress's focus on domestic transactions, the Court categorically limited the territorial reach of the statute by establishing that § 10(b)

---

purely jurisdictional statutes, such as the ATS. *See, e.g.*, *Morrison*, 561 U.S. at 273 (holding that the presumption against extraterritoriality applied to section 10(b) of the Securities Exchange Act, precluding claims for misconduct in connection with securities traded on foreign exchanges); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 159 (1991) (holding that section 243(h) of the Immigration and Nationality Act of 1952 did not apply extraterritorially); *Equal Opportunity Emp't Comm'n v. Arabian Am. Oil Co.*, 499 U.S. 244, 259 (1991) (holding that Title VII of the Civil Rights Act of 1964 did not apply extraterritorially). While mindful of the distinction between substantive and jurisdictional statutes, we think the Court's analysis in the above cases, applying the presumption against extraterritoriality to substantive statutes, is instructive and relevant to the question presented here.

applies "only [to] transactions in securities listed on domestic exchanges, and domestic transactions in other securities*." Id.* at 267; *see id.* at 285 (Stevens, J., concurring in the judgment) (characterizing Court's test as a "bright-line rule[]"); *City of Pontiac*, 752 F.3d at 180 (same).

Adopting the Supreme Court's methodology in *Morrison*, the first step of our inquiry here involves an evaluation of the "territorial event[s]" or "relationship[s]" that were the "focus" of the ATS. *Morrison*, 561 U.S. at 266. This inquiry again begins with the Supreme Court's most comprehensive and recent examination of the ATS in *Kiobel*. There, plaintiffs were Nigerian nationals who accused Dutch, British, and Nigerian corporations of aiding and abetting violations of customary international law by Nigerian military and police forces. *Kiobel*, 133 S. Ct. at 1662. Plaintiffs claimed that the defendant multi-national corporations aided and abetted the abuses by "providing the Nigerian forces with food, transportation, and compensation, as well as by allowing the Nigerian military to use respondents' property as a staging ground for attacks." *Id.* at 1662-63. The United States ties alleged were that defendants' shares were traded on the New York Stock Exchange, and that they had a New York City office (owned by an affiliate) that "helps to explain their business to potential investors." *Id.* at 1677 (Breyer, J., concurring in the judgment).

Focusing on the fact that "all the relevant conduct took place outside the United States," the Supreme Court held that the ATS did not extend to plaintiffs' claims. *Id.* at 1669. In *Balintulo*, we explained

that the phrase "relevant conduct" in *Kiobel* referred, at all times and "[i]n *all* cases," to the conduct constituting the alleged offenses under the law of nations. *Balintulo*, 727 F.3d at 189-90, 192. [10] Indeed, we undertook a careful examination of the Supreme Court's choice of language in *Kiobel*, and underscored that, on at least eleven occasions, the Court "framed" its analysis as one "focusing solely on the location of the relevant 'conduct' or 'violation.'" *Id.* at 189 (quoting *Kiobel*, 133 S. Ct. at 1665-69). Accordingly, in conducting our extraterritoriality analysis, we looked solely to the site of the alleged violations of customary international law. *Id.* at 189-90.[11]

---

[10] We have recently had another occasion to apply the Supreme Court's *Kiobel* holding in *Chowdhury*, 746 F.3d 42, where we determined that, because all of the conduct set forth in plaintiff's complaint occurred in Bangladesh, his claims brought under the ATS were not cognizable. *Id.* at 49-50.

[11] After determining that the ATS does not apply extraterritorially, the Supreme Court in *Kiobel* had no need to decide what allegations would be sufficient to displace the presumption, because the *Kiobel* plaintiffs did not allege any conduct that took place in the United States.

However, in his concurring opinion in *Kiobel*, Justice Alito did explicitly apply the *Morrison* "focus" analysis to the ATS. In doing so, he noted that, pursuant to the Supreme Court's opinion in *Sosa*, 542 U.S. 692, "when the ATS was enacted, congressional concern was focus[ed] on the three principal offenses against the law of nations that had been identified by Blackstone: violation of safe conducts, infringement of the rights of ambassadors, and piracy." 133 S. Ct. at 1670 (Alito, J., concurring) (internal quotation marks and citation omitted). He thus concluded that "a putative ATS cause of action will fall within the scope of the presumption against extraterritoriality— and will therefore be barred—unless the domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations." *Id*.

We agree that a defendant's domestic conduct must be the focal point of our inquiry. This reflects the perspective of the majority opinion of the Chief Justice in *Kiobel*

We then applied this ATS "focus" analysis—examining the conduct alleged to constitute violations of the law of nations, and the location of that conduct—to the facts of *Balintulo* itself. There, the conduct at issue was the sale, by subsidiaries of the defendant corporations, of cars and computers to the apartheid government of South Africa, which allegedly aided and abetted that regime's violations of customary international law. *Id.* at 182-83. Of particular relevance to the instant case, the *Balintulo* plaintiffs predicated their claim on an assertion that defendants "took affirmative steps in this country to circumvent the sanctions regime" against South Africa. *Id.* at 192.

We rejected the *Balintulo* plaintiffs' arguments, holding that their allegations were insufficient to displace the presumption. We reasoned that defendants' alleged domestic conduct lacked a clear link to the human rights abuses occurring in South Africa that were at the heart of plaintiffs' action. *Id.* (stating that none of plaintiffs' allegations "ties the relevant human rights violations to actions taken within the United States"). We thus concluded that the alleged violations were "based solely on conduct occurring abroad," and

---

and its repeated emphasis on "the location of the relevant 'conduct' or 'violation.'" *Balintulo*, 727 F.3d at 189. Accordingly, the site of the alleged violation should be the central inquiry for lower courts asked to apply the *Kiobel* presumption to facts allegedly sufficient to overcome it.

hence were not cognizable in U.S. courts under the teachings of the Supreme Court in *Kiobel*. *Id*. at 182.[12]

### 3. Displacing the Presumption Against Extraterritoriality Under the ATS

Drawing upon the guidance provided by the Supreme Court in *Morrison* and *Kiobel*, and by this Court in *Balintulo*, a clear principle emerges for conducting the extraterritoriality-related jurisdictional analysis required by the ATS: that the "focus" of the ATS is on conduct and on the location of that conduct. Thus, in determining whether the ATS confers on a federal court jurisdiction over a particular case, a district court must isolate the "relevant conduct" in a complaint. That conduct is the conduct of the defendant which is alleged by plaintiff to be either a direct violation of the law of nations or, as we recognized in *Presbyterian Church*, 582 F.3d at 259, conduct that constitutes aiding and abetting another's violation of the law of nations. In determining whether this conduct displaces the presumption, the district court must engage in a two-step jurisdictional analysis of this conduct.

---

[12] In *Balintulo*, we denied defendants' request that we issue a writ of mandamus ordering the District Court to dismiss all claims against them. We denied that request because we held that, in light of the *Kiobel* presumption, recognized by the Supreme Court while the *Balintulo* appeal was pending, "the defendants w[ould] be able to obtain their desired relief (dismissal of all claims) in the District Court through a motion for judgment on the pleadings, without resort to a writ of mandamus." *Balintulo*, 727 F.3d at 182. As described above, our decision to deny the extraordinary writ of mandamus was based on the holding that the plaintiffs' alleged "violations of customary international law based solely on conduct occurring abroad" were not cognizable in U.S. courts under the ATS. *Id*.

The first step is to determine whether the "relevant" conduct—conduct which constitutes a violation of the law of nations or aiding and abetting such a violation—sufficiently "touches and concerns" the territory of the United States so as to displace the presumption against extraterritoriality. *Kiobel*, 133 S. Ct. at 1669.

The second step is to make a preliminary determination that the relevant conduct—which the court has determined sufficiently "touches and concerns" the United States so as to displace the presumption—may in fact be relied upon in establishing jurisdiction. This is done through a preliminary determination that the complaint adequately states a claim that the defendant violated the law of nations or aided and abetted another's violation of the law of nations. As with all allegations contained in a complaint, the pleaded conduct must be "plausibl[e]," and allow the court "to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, and must—at least upon an initial examination by the district judge—appear to satisfy the standard for alleging a violation of the law of nations or aiding and abetting such a violation. This initial "glimpse" at what is ordinarily a merits determination is necessary due to the unique character of the ATS as a jurisdictional statute that derives substantive meaning from customary international law. Thus, jurisdiction can only properly be asserted over conduct that is in fact a violation of customary international law or aiding and abetting a violation. By "glimpsing" at the merits at the jurisdictional stage, the district court ensures that the conduct

alleged in a complaint may properly be relied upon by the court in conducting its extraterritoriality analysis.

Where a complaint alleges domestic conduct of the defendant (that, the court determines, displaces the presumption against extraterritoriality), *but* such conduct does not satisfy even a preliminary assessment of the merits, the court may not rely on that conduct for its extraterritoriality analysis. In such a circumstance, the complaint does not only fail on the merits, but must also fail as a jurisdictional matter, because where the conduct alleged does not state a claim under customary international law, it cannot form the basis of a court's jurisdiction. *See Kadic*, 70 F.3d at 238 ("Because the Alien Tort Act requires that plaintiffs plead 'a violation of the law of nations' at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction . . . . There is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations.") (citing *Filartiga*, 630 F.2d at 887-88). This second step of the extraterritoriality analysis ensures, as Justice Breyer stated in his *Kiobel* concurring opinion, that "the statute's jurisdictional reach [will] match the statute's underlying substantive grasp." *Kiobel*, 133 S. Ct. at 1673 (Breyer, J., concurring in the judgment).[13]

---

[13] We observe that Justice Breyer's opinion explicitly regarded the extraterritoriality analysis required by the majority opinion in *Kiobel* to be jurisdictional in nature, a conclusion that triggered no protest from the majority. *Id.* at 1673 (Breyer, J., concurring in the judgment). This approach is consistent with our understanding of the ATS as a "strictly jurisdictional" creature. *Sosa*, 542 U.S. at 713. Accordingly, the general presumption that a limitation on a statute's coverage will be treated as nonjurisdictional

Finally, we note that although a district court might deny a motion to dismiss brought pursuant to Rule 12(b)(1) if it concludes that the *complaint* passes jurisdictional muster, that does not obviate the district court's continuing obligation to ensure its own jurisdiction as the case proceeds to discovery. If subsequent materials in the record cast sufficient doubt upon the allegations in the complaint that formed the basis for the court's subject-matter jurisdiction, the court must revisit the question of its jurisdiction *sua sponte*, or upon a party's motion. *See, e.g.*, *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 593 (2004) ("[I]t is the obligation of both district court and counsel to be alert to jurisdictional requirements."); *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 107 (2d Cir. 1997) ("The failure of the parties to contest the district court's authority to hear a case does not act to confer federal jurisdiction since a challenge to subject matter jurisdiction cannot be waived and may be raised either by motion or *sua sponte* at any time.") (internal quotation marks, ellipses, and brackets omitted).

## 4.  Relevant and Irrelevant Considerations

As we have explained above, in order to displace the presumption against extraterritoriality and establish federal subject matter jurisdiction over an ATS claim, the complaint must plead: (1) conduct of the defendant that "touch[ed] and

---

unless Congress clearly states otherwise, *see Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006), is not applicable in the context of the ATS.

concern[ed]" the United States with sufficient force to displace the presumption against extraterritoriality, *and* (2) that the *same conduct*, upon preliminary examination, states a claim for a violation of the law of nations or aiding and abetting another's violation of the law of nations.

In evaluating the "relevant" conduct, we are mindful of the Supreme Court's emphasis on the potential foreign policy implications of the ATS. *See Kiobel*, 133 S. Ct. at 1664-65. In all cases applying the presumption against extraterritoriality to statutes, courts must be careful to recall the relevance of this canon—namely, "to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Equal Opportunity Emp't Comm'n v. Arabian Am. Oil Co.* ("*ARAMCO*"), 499 U.S. 244, 248 (1991); *see also Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (holding a claim brought under § 10(b) of the Securities Exchange Act barred as extraterritorial because "the application of § 10(b) to the defendants would so obviously implicate the incompatibility of U.S. and foreign laws that Congress could not have intended it *sub silentio*"). This core purpose of the presumption is even more pronounced here: "[T]he danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the ATS, because the question is not what Congress has done but instead what courts may do." *Kiobel*, 133 S. Ct. at 1664. Describing the dangers inherent when courts impinge on the role of the executive and legislative branches in

managing foreign policy, the Court explained, "[t]hese concerns, which are implicated in any case arising under the ATS, are all the more pressing when the question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign." *Id.* at 1665. Thus, as instructed by the Supreme Court, the lower federal courts must proceed with caution when determining whether a particular case alleges conduct that is sufficiently "domestic," such that the presumption is "displaced" (*i.e.,* does not apply).

Furthermore, in identifying the conduct which must form the basis of the violation *and* the jurisdictional analysis under the ATS, precedents make clear that neither the U.S. citizenship of defendants, nor their presence in the United States, is of relevance for jurisdictional purposes. First, in *Kiobel* the Court explicitly stated that "mere corporate presence" in the United States would be insufficient to displace the presumption against extraterritoriality. 133 S. Ct. at 1669. And in *Balintulo*, we described a defendant's citizenship as "an irrelevant factual distinction," and expressly rejected plaintiff's contention that "corporate citizenship [of a defendant] in the United States is enough" to displace the presumption. 727 F.3d at 189-90. And indeed, in another case in which the Supreme Court assessed the extraterritorial effect of a statute, the fact that the defendant corporations were American did not render defendant's overseas activities sufficiently domestic. *See ARAMCO*, 499 U.S. at 247 (holding that Title VII of the Civil Rights Act of 1964 did not apply

extraterritorially to a Delaware corporation's treatment of its U.S. citizen employee in Saudi Arabia).

Recently, the Eleventh Circuit reached the same conclusion. In *Cardona v. Chiquita Brands Int'l, Inc.*, the Court of Appeals rejected plaintiffs' "attempt to anchor ATS jurisdiction in the nature of the defendants as United States corporations." 760 F.3d at 1189. In discarding this argument, the Court of Appeals quoted the Supreme Court's directive in *Kiobel* that "mere corporate presence" does not suffice to displace the presumption, and it identified no significant distinction between corporate presence and citizenship for purposes of analyzing domestic connections. *Id*. (quoting *Kiobel*, 133 S. Ct. at 1669).

Other courts have considered a defendant's U.S. citizenship as one germane factor among numerous factors that, when viewed together, sufficiently "touch and concern" the United States so as to confer jurisdiction on the federal courts over a case. In *Al Shimari v. CACI Premier Technology Inc.*, 758 F.3d 516 (4th Cir. 2014), the Fourth Circuit held that ATS claims related to alleged torture of plaintiffs that took place at the Abu Ghraib prison in Iraq, at the hands of interrogators employed by the defendant corporation, sufficiently "touched and concerned" the United States. *Id.* at 530. The Court of Appeals reached this conclusion based upon the combination of numerous domestic contacts, including: defendant's status as a U.S. corporation; the U.S. citizenship of defendant's employees, "upon whose conduct the ATS claims are based"; defendant's status as a contractor of the U.S. government; and allegations of domestic

conduct by defendants in approving, encouraging, and covering up the alleged torture.[14] *Id*. at 530-31.

We disagree with the contention that a defendant's U.S. citizenship has any relevance to the jurisdictional analysis. The Supreme Court made clear in *Kiobel* that the full "focus" of the ATS was on conduct. *See Balintulo*, 727 F.3d at 190-91 & n.24. Whether a complaint passes jurisdictional muster accordingly depends upon alleged conduct by *anyone*—U.S. citizen or not—that took place in the United States and aided and abetted a violation of the law of nations. A complaint cannot be "saved" for jurisdictional purposes simply because a U.S. citizen happened to commit the alleged violation; similarly, our jurisdiction over actions taken within the United States is not less clear where they are actions of a foreign

---

[14] Some district courts have similarly considered a defendant's U.S. citizenship as one pertinent factor among others, including the defendant's conduct. In *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304 (D. Mass. 2013), the court held that the presumption against extraterritoriality was displaced by distinguishing the case from *Kiobel* in two ways: (1) because "[d]efendant is an American citizen residing within . . . Massachusetts" and (2) because "the tortious acts committed by [d]efendant took place to a substantial degree within the United States," including "planning and managing a campaign of repression in Uganda from the United States." *Id*. at 321-22. The court likened defendant's U.S.-based conduct to "a terrorist designing and manufacturing a bomb in this country," which he then detonates overseas. *Id*. at 322. As explained above, we would look only to defendant's conduct in the United States, but not to his citizenship in determining our jurisdiction. *See also Du Daobin v. Cisco Sys., Inc.*, 2 F. Supp. 3d 717, 728 (D. Md. 2014) (assuming, without deciding, that the presumption against extraterritoriality was displaced in an ATS case because: (1) defendant was an American, rather than foreign, corporation, and (2) "developmental actions relevant to the [alleged law of nations violation] took place predominantly, if not entirely, within the United States," and "defendant . . . has taken certain actions within the United States with respect to products that might be primarily used for violations of the laws of nations").

national rather than a U.S. citizen.[15] *Cf. Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) (noting, in a case applying the Supreme Court's *Morrison* opinion, that in identifying domestic as opposed to extraterritorial transactions, "[a] purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States") (internal quotation marks omitted).

## 5.  Application

We now turn to the complaint at hand, looking to see whether the complaint has pleaded: (1) conduct by defendants that "touch[ed] and concern[ed]" the United States with sufficient force to displace the presumption against extraterritoriality, *and* (2) that the *same conduct*, upon preliminary examination, states a claim for a

---

[15] In conducting the "touch and concern" jurisdictional analysis, one district court, faced with an ATS claim against Osama bin Laden and al-Qaeda stemming from the bombing of the U.S. Embassy in Nairobi, looked to both defendants' U.S.-based conduct, as well as the intended effect of the conduct in the United States. *See Mwani v. Laden*, 947 F. Supp. 2d 1, 5 (D.D.C. 2013). There, the court held that the claims at issue sufficiently "touched and concerned" the United States so as to confer the court with ATS jurisdiction, because "[s]urely, if any circumstances were to fit the Court's framework of 'touching and concerning the United States with sufficient force,' it would be a terrorist attack that 1) was plotted in part within the United States, and 2) was directed at a United States Embassy and its employees," and certified that disposition for immediate review by the D.C. Circuit. *Id*. Because, in the case before us, plaintiffs do not assert that the Saddam Hussein regime's alleged violations of the law of nations were directed at, or felt in, the United States, we leave for another day the question of whether and how that fact might affect the jurisdictional analysis.

violation of the law of nations or aiding and abetting another's violation of the law of nations.

The conduct alleged in the complaint that plaintiffs contend is sufficient to displace the presumption against extraterritoriality is that: (1) the OFP was created, administered, and its contracts were approved by the United Nations in New York City, where the United Nations headquarters is located; (2) Chevron is headquartered in the United States, which means that many decisions related to the alleged violations of the OFP were "necessarily made by the top stake holders at Chevron in the United States"; (3) Chevron engaged in transactions with other U.S. companies involving the OFP oil and illicit surcharges, and its "profits reaped from the transactions were recouped in the United States"; and (4) BNP entered into a Banking Agreement with the United Nations in New York pursuant to which it maintained an escrow account in New York City through which all OFP funds moved, including the illicit surcharge payments.

First, the fact that the United Nations is located in New York, and that the OFP's inception and administration occurred in New York, is irrelevant. Such allegations, by themselves, are not facts related to defendants at all, let alone alleged conduct taken by defendants to aid and abet violations of the law of nations.

Second, where Chevron is headquartered is also immaterial, because, as just discussed, the relevant inquiry is on conduct constituting a violation of customary international law or of aiding

and abetting such violations, not on where defendants are present. A defendant's nationality or citizenship is pertinent only insofar as it relates to its alleged U.S. conduct.

Third, our jurisdictional analysis need not take into account allegations that, on their face, do not satisfy basic pleading requirements. Allegations must be more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Plaintiffs' assertion that, because Chevron was headquartered in the United States, "much of the decisionmaking to participate in the [OFP] scheme" was necessarily made in the United States, is just such a conclusory assumption. Appellants' Ltr. Br. 4.[16]

Yet plaintiffs do make additional allegations of Chevron and BNP's U.S.-based attempts to skirt the sanctions regime, the combination of which appear to "touch and concern" the United States with sufficient force to displace the presumption. For example, plaintiffs allege that Iraqi oil under contract with Russian companies "was in fact purchased and financed . . . in the United States" by Chevron, Compl. ¶ 57, and that "Chevron financed the sale of two million barrels of oil to Bulf Oil through Midway Oil of Reston, Virginia" for which Chevron "facilitated" "a surcharge

---

[16] We also note that the only place plaintiffs allege that "decisionmaking to participate in the scheme" took place in the United States was in their supplemental letter brief, rather than in their complaint. Appellants' Ltr. Br. 4. Nevertheless, we include it in our analysis as a corollary of the clearly-pleaded facts of Chevron's United States activities related to the alleged OFP violations. *See* App'x 12.

payment of nearly half a million dollars be paid to the [Saddam Hussein] regime," *id.* ¶¶ 73-75. They further allege, as a general matter, that "profits rendered from the transactions w[ere] recouped in the United States." *Id.* ¶ 17.

Regarding BNP, plaintiffs allege that BNP "maintained the escrow account in New York City" through which all payments were transmitted pursuant to the OFP. Appellants' Ltr. Br. 4. They further allege that "BNP allowed payments through the New York escrow account that included kickbacks to the [Saddam Hussein] Regime," that "BNP's financing arrangements in New York allowed the oil purchasers to conceal the true nature of the oil purchase." *Id.* at 5. Allegedly, "BNP enabled the oil purchasers and humanitarian goods suppliers to include funds [diverted to the Saddam Hussein regime] which were not captured in the escrow account," and the illicit "oil surcharge scheme relied on the financing arrangements made by BNP Paribas in three-fourths of the transactions." Compl. ¶¶ 113-14, 121.

This particular combination of conduct in the United States— on the part of Chevron, multiple domestic purchases and financing transactions; on the part of BNP, numerous New York-based payments and "financing arrangements" conducted exclusively through a New York bank account—is both specific and domestic. These allegations assert non-conclusory conduct that appears to "touch[ ] and concern[ ]" the United States with sufficient force to displace the presumption against extraterritoriality and establish our

jurisdiction under the ATS,[17] if such conduct also meets the second prong of our extraterritoriality analysis—*i.e.*, if it satisfies a preliminary determination that such conduct aided and abetted a violation of the law of nations. To do this, we provide a brief overview of the elements necessary to state a claim for aiding and abetting a violation of the law of nations under the ATS.

Our decision in *Presbyterian Church* resolved earlier uncertainty about the elements of a claim of aiding and abetting liability under the ATS. There, plaintiffs were Sudanese citizens who brought suit under the ATS against a Canadian oil company, alleging that security arrangements for the company carried out by the Sudanese government led to persecution of citizens living near oil concession areas. 582 F.3d at 249-52. Evaluating whether it was sufficient to state a claim that the defendant company *knew* of the alleged abuses, we held that "the *mens rea* standard for aiding and abetting liability in ATS actions is *purpose* rather than knowledge

---

[17] In concluding that these allegations of domestic conduct "touch[ ] and concern[ ]" the United States with sufficient force to displace the presumption against extraterritoriality, we note the analytical similarity between the allegations in this complaint, and those in another case in which the district court conducted the ATS extraterritoriality analysis according to the framework we have articulated here. In *Krishanti v. Rajaratnam*, the district court found that it had subject matter jurisdiction over the ATS claims because, although the alleged effects of defendant's violations of the law of nations were felt exclusively in Sri Lanka, the claim was based entirely on "alleged actions that occurred within the United States" including defendant's hosting of meetings and fundraisers for a foreign terrorist organization in New Jersey, donating money to a U.S.-based group which was purposefully funneled to the terrorist organization, and creating corporations in the United States to further facilitate donations to the terrorist organization. No. 2.09 Civ. 05395, 2014 WL 1669873, at *10 (D.N.J. Apr. 28, 2014).

alone." *Id*. 259 (emphasis supplied). [18] We noted the lack of a sufficient international consensus "for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law." *Id*. Assuming, without deciding, that conspiracy liability for completed offenses was a valid theory in an ATS action,[19] we also concluded that any such claims would require the same *mens rea* element as claims for aiding and abetting. *Id*. at 260.

In establishing this standard as the law of the Circuit, the unanimous *Presbyterian Church* panel relied substantially and expressly on Judge Katzmann's concurring opinion in an earlier

---

[18] It is not disputed that this *mens rea* standard—requiring defendants to act with the purpose of aiding and abetting violations of the law of nations—has become the law of the Circuit. *See, e.g.*, *In re Terrorist Attacks on September 11, 2001*, 718 F. Supp. 2d 456, 493-94 (S.D.N.Y. 2010), *aff'd on other grounds*, 714 F.3d 118, 125 (2d Cir. 2013); *Ahmad v. Christian Friends of Israeli Cmtys.*, No. 13 Civ. 3376, 2014 WL 1796322, at *5 (S.D.N.Y. May 5, 2014). In his opinion concurring in the judgment in this Circuit's *Kiobel* opinion, Judge Leval would have rested the decision to dismiss the complaint in that case on a conclusion that the complaint did "not contain allegations supporting a reasonable inference that Appellants acted with a purpose of bringing about the alleged abuses." *Kiobel*, 621 F.3d at 188 (Leval, J., concurring in the judgment); *see also id.* at 158 ("In this circuit, supplying financing or military equipment to a local government will not support the imposition of aiding and abetting liability on the corporation for that government's abuses unless the corporation acted *with a purpose* to promote or advance those violations. . . . A true question of tort liability for corporate aiding and abetting in government atrocities would be raised where such a defendant *purposely* procures the commission of genocide by local government forces."); *Kiobel v. Royal Dutch Petroleum Co.*, 642 F.3d 379, 380 (Katzmann, J., dissenting in the denial of reh'g en banc) ("In *Presbyterian Church* . . . the unanimous panel—Chief Judge Jacobs, Judge Leval, and Judge Cabranes—adopted [Judge Katzmann's *Khulumani*] analysis as the 'law of this Circuit,' and held that we must look 'to international law to find the standard for accessorial liability' under the AT[S].") (quoting *Presbyterian Church*, 582 F.3d at 258-59)).

[19] *See* Section II.B, *ante*.

case, *Khulumani*, 504 F.3d at 264. There, Judge Katzmann conducted a lengthy analysis of relevant sources of international law and concluded that "a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the *purpose* of facilitating the commission of that crime." *Id*. at 277 (emphasis supplied). [20] Accordingly, the defendant's "complicity" in the government's abuses in *Presbyterian Church*, without more, was insufficient to establish a claim of aiding and abetting or conspiracy under the ATS. 582 F.3d at 263.

Upon a preliminary analysis of the conduct alleged in the complaint—conducted merely to confirm that this conduct, upon which we would otherwise rely in holding that the presumption against extraterritoriality is displaced, may in fact form the basis of our jurisdiction—we conclude that plaintiffs clearly do not meet the *mens rea* requirement established in *Presbyterian Church*.[21] In their

---

[20] Judge Katzmann reminded those relying on his reasoning that "[i]nternational law, like our domestic law, can change." *Khulumani*, 504 F.3d at 277. On that score, he noted in passing that "there is some support . . . for a definition of aiding and abetting that would lead to liability where an individual provides substantial assistance with the *knowledge* that the acts performed by the aider and abettor assist the commission of the specific crime of the principal." *Id*. at 278 (emphasis supplied) (internal quotation marks omitted). However, this arguable opening offers no assistance to plaintiffs in this action, because they do not suggest, much less show, that international law norms have shifted to recognize a different or broader rule of aiding and abetting liability since the *Khulumani* and *Presbyterian Church* decisions.

[21] This analysis applies with equal force to plaintiffs' claim predicated upon a theory of conspiracy. Although we do not decide whether conspiracy is in fact available

supplemental brief, plaintiffs summarize their *mens rea* allegations as follows: "the complaint alleges that Chevron and BNP acted both with the express *purpose* of violating the rules governing the Oil for Food Programme" and "*knew* full well that doing so promoted serious human rights abuses in Iraq." Appellants' Ltr. Br. 6 (emphasis added).[22] In other words, plaintiffs assert that defendants acted *purposefully* in violating the OFP, but merely *knowingly* in aiding and abetting the underlying violations of the law of nations.[23]

---

under customary international law, we have already held that "under a theory of relief based on a joint criminal enterprise, plaintiffs' conspiracy claims would require the same proof of *mens rea* as their claims for aiding and abetting." *Presbyterian Church*, 582 F.3d at 260.

[22] *See, e.g.*, Compl. ¶ 14 ("The Defendants . . . supported, assisted, bolstered, and aided the Saddam Hussein regime . . . with full knowledge of the [abuses].*"); id.* ¶ 46 ("The payments that Chevron knowingly made to the Saddam Regime were a substantial factor in causing the [abuses]."); *id.* ¶ 76 ("Chevron knew the surcharge was illegal."); *id.* ¶ 90 ("Chevron knew that the surcharge payments were substantially aiding the Saddam Regime in its campaign of torture and abuse of the Plaintiffs and the members of their class."); *id.* ¶ 143 ("BNP had first hand knowledge of the true nature of the financial transactions to purchase oil and failed to disclose the information or prevent payments from being made directly to the Saddam Regime.").

[23] Plaintiffs also argue, without further explanation or support in the case law, that the instant case is distinct from *Presbyterian Church* because "abuses of the Oil for Food Programme . . . are *themselves* violations of international law." Appellants' Ltr. Br. 7. This assertion reflects a misunderstanding of basic principles of our ATS jurisprudence, and an explanatory note is thus in order lest others seek to advance a similarly misplaced argument.

As we explained earlier, *see* Part II.A, *ante*, The ATS does not confer the federal courts with jurisdiction over any and all arguable violations of international law. Rather, ATS jurisdiction is much narrower, recognizing a "modest number" of claims, each of which must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Sosa*, 542 U.S. at 724-25. As we have previously explained, it

Plaintiffs thus miss the mark and misconstrue our clear holding in *Presbyterian Church*. The relevant inquiry at all times is whether plaintiffs' complaint "supports an inference that [defendants] acted with the 'purpose' to advance the Government's human rights abuses," *Presbyterian Church*, 582 F.3d at 260, *not* whether defendants merely *knew* that those abuses were occurring and that defendants' business was enabling such acts. Plaintiffs' allegations that defendants *intentionally* flouted the sanctions regime for profit, or that they *knew* their actions were in violation of United Nations Security Council resolutions, or "international law," or U.S. policy are irrelevant to the *mens rea* inquiry; rather, our analysis necessarily focuses on allegations that defendants *intended* to aid and abet violations of *customary international law* carried out by the Saddam Hussein regime—a contention that is unsupported by the facts alleged in the complaint.[24]

---

applies only to violations of "customary international law," a body of law which "reflect[s] the practices and customs of States in the international arena that are applied in a consistent fashion and that are generally recognized by what used to be called 'civilized states.'" *United States v. Yousef*, 327 F.3d 56, 92 (2d Cir. 2003). As Judge Friendly explained, even if a legal norm appears in the domestic code of every "civilized nation"—robbery, murder, and thuggery of all kinds are examples—it only rises to the level of customary international law if it "(a) affect[s] the relationship between states or between an individual and a foreign state, and (b) [is] used by those states for their common good and/or in dealings *inter se*." *Vencap*, 519 F.2d at 1015. Customary international law "does not stem from any single, definitive, readily-identifiable source," *Flores*, 414 F.3d at 248, and thus, contrary to plaintiffs' assertion above, it is incorrect to simply conflate any violation of "international law" with a violation of *customary* international law. *See also* Section II.A, *ante*.

[24] The fact pattern presented here is similar in some relevant respects to that encountered by the Fourth Circuit in *Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011), and

Where the complaint appears to allege something akin to *purpose*, it does so in conclusory terms and fails to establish even a baseline degree of plausibility of plaintiffs' claims. For example, the complaint alleges in its introduction that "[d]efendants conspired with the Saddam Hussein regime to maintain control and power over Iraq in order to secure mutual financial benefits through the egregious affronts on the human rights of the [p]laintiffs." Compl. Introduction. Plaintiffs never elaborate upon this assertion in any way that establishes the plausibility of a large international corporation intending—and taking deliberate steps with the purpose of assisting—the Saddam Hussein regime's torture and abuse of Iraqi persons. *See Kiobel*, 621 F.3d at 192 (Leval, J., concurring in the judgment) ("[T]he complaint pleads also in conclusory form that the Nigerian military's campaign of violence against the [victim-

the Court of Appeals' reasoning there is instructive. There, the defendant was a British company that sold a certain chemical—which could be used to make mustard gas—to another company that was a shell corporation facilitating acquisition of the chemical for the Iraqi government, in violation of U.S. law. *Id*. at 391. Plaintiffs were individuals of Kurdish descent who either were harmed by Iraqi government chemical attacks, or were relatives of those killed by such attacks. *Id*. The Fourth Circuit first relied upon our opinion in *Presbyterian Church*, and Judge Katzmann's reasoning in his concurring opinion in *Khulumani*, to hold that claims of aiding and abetting are cognizable under the ATS, *see id.* at 396, and then held that such claims must be based on an allegation that defendants had the *purpose* of facilitating the violations, *id*. at 401.

Applying those conclusions to the circumstances there presented, the Fourth Circuit held that plaintiffs did not sufficiently plead intentional conduct by claiming, without further explanation, that defendant had "placed [the chemical at issue] into the stream of international commerce with the purpose of facilitating the use of said chemicals in the manufacture of chemical weapons to be used, among other things, against the Kurdish population in northern Iraq." *Id*. at 401. Here, the complaint's allegations relating to intentional conduct are similarly lacking, unsubstantiated, and conclusory.

plaintiffs] was 'instigated, planned, facilitated, conspired and cooperated in' by [defendant corporation]. Such pleadings are merely a conclusory accusation of violation of a legal standard and do not withstand the test of *Twombly* and *Iqbal*."). Other points at which the complaint seems to allege purposeful action are similarly conclusory, and also fail to directly link the allegedly intentional conduct with the human rights abuses at the heart of the complaint.[25] They thus fall short of the pleading standards required by *Iqbal* and *Twombly*.

In the instant case, the District Court correctly recognized this pleading deficiency, albeit in its discussion of the TVPA. It concluded that "nothing in the complaint suggests (even in a conclusory fashion) that the defendants acted with the purpose of facilitating human rights abuses," and went even further, concluding that the "claims as presently pleaded even fail to meet the less stringent common law standard for aiding-and-abetting liability, which requires that the defendants had 'actual knowledge' that their actions would contribute to the commission of human rights abuses." *Mastafa v. Chevron Corp.*, 759 F. Supp. 2d 297, 300 (S.D.N.Y. 2010).

---

[25] *See, e.g.*, Compl. ¶ 163 ("Defendants acted as part of a conspiracy to profit from violating the law of nations . . . in an effort and with the intent to profit from such violations*.");* *id.* ¶ 165 ("Defendants had the unlawful object[ive] of profiting from violations of [international law]*.");* *id.* ¶ 173 ("Defendants acted as part of a common design with the Saddam Hussein Regime to violate international law and receive illicit profits which was a direct and proximate cause of the [abuses].").

Because the complaint fails plausibly to plead that defendants' conduct related to aiding and abetting the alleged violations of customary international law was intentional, that conduct cannot form the basis for our jurisdiction.

Accordingly, we conclude that the District Court did not have subject-matter jurisdiction over this case.

## CONCLUSION

To summarize, we hold that:

(1) The defendants in this action are corporations, and thus, pursuant to the Supreme Court's decision in *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012), they indisputably are not subject to liability under the TVPA.

(2) In adjudicating claims brought under the ATS, a "jurisdictional statute," courts should begin their analysis with the question of their jurisdiction over such claims before proceeding to a determination on the merits.

(3) There are several jurisdictional predicates that must be satisfied before a court can be assured of its jurisdiction over an ATS claim, and the order and manner in which a district court undertakes these inquiries is a matter of discretion based upon the particular circumstances presented.

(4) Plaintiffs here satisfied their burden of asserting causes of action grounded in actions recognized as violations of customary international law.

(5) Plaintiffs alleged a theory of liability—aiding and abetting—that is cognizable under customary international law.

(6) In determining whether a claim under the ATS sufficiently "touches and concerns" the United States with sufficient force to displace the presumption against extraterritorial application, courts must consider the following principles:

    a. Under the Supreme Court's decisions in *Morrison* and *Kiobel*, and our Court's opinion in *Balintulo*, the "focus" of the ATS—and, thus, the focus of the jurisdictional inquiry—is the conduct alleged to violate the law of nations (or alleged to aid and abet the violation of the law of nations), and where that conduct occurred.

    b. To establish our jurisdiction under the ATS, the complaint must plead: (1) conduct of the defendant that "touch[ed] and concern[ed]" the United States with sufficient force to displace the presumption against extraterritoriality, *and* (2) that the *same conduct*, upon preliminary examination, states a claim for a violation of the law of nations or aiding

and abetting another's violation of the law of nations.

c. In identifying the "relevant conduct" for jurisdictional purposes, Supreme Court and Second Circuit precedent make clear that neither the U.S. citizenship of defendants, nor their mere presence in the United States, is relevant to a court's determination of its jurisdiction.

d. Here, plaintiffs have alleged specific, domestic conduct in the complaint—namely, Chevron's oil purchases, financing of oil purchases, and delivery of oil to another U.S. company, all within the United States; and BNP's use of a New York escrow account and New York-based "financing arrangements" to systematically enable illicit payments to the Saddam Hussein regime that allegedly facilitated that regime's violations of the law of nations, namely war crimes, genocide, and other crimes against humanity. This U.S.-based conduct "touches and concerns" the United States to satisfy the first prong of our extraterritoriality analysis.

e. The complaint fails plausibly to plead that defendants' conduct related to aiding and abetting the alleged violations of customary international law was intentional, and accordingly, the conduct cannot

state a claim for aiding and abetting liability under the ATS and thus cannot form the basis for our jurisdiction.

For the reasons stated above, the judgment of the District Court is AFFIRMED.