14-4104 (L)
*Balintulo v. Ford Motor Co.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2014

Nos. 14-4104(L), 14-3589, 14-3607, 14-4129, 14-4130,
14-4131, 14-4132, 14-4135, 14-4136, 14-4137, 14-4138, 14-4139

SAKWE BALINTULO,
as personal representative of SABA BALINTULO, et al.,
*Plaintiffs-Appellants*,

v.

FORD MOTOR CO., INTERNATIONAL BUSINESS MACHINES CORP.,
*Defendants-Movants*.

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: JUNE 24, 2015
DECIDED: JULY 27, 2015

Before: CABRANES, HALL, and LIVINGSTON, *Circuit Judges*.

This appeal presents the question of whether plaintiffs, victims of South African apartheid, have plausibly alleged relevant conduct committed within the United States that is sufficient to rebut the Alien Tort Statute's presumption against extraterritoriality.

We hold that they have not.

Accordingly, we **AFFIRM** the August 28, 2014 order of the United States District Court for the Southern District of New York (Shira A. Sheindlin, *Judge*).

———

> PAUL L. HOFFMAN (Diane E. Sammons, Nagel Rice, LLP, Roseland, NJ; Michael D. Hausfeld, Kristen M. Ward, Hausfeld, Washington, DC, *on the brief*), Schonbrun, Desimone, Seplow, Harris & Hoffman LLP, Venice, CA, *for Plaintiffs-Appellants.*
>
> JONATHAN HACKER (Anton Melitsky, *on the brief*), O'Melveny & Myers LLP, New York, NY, *for Defendant-Movant Ford Motor Company.*
>
> KEITH R. HUMMEL (Teena-Ann V. Sankoorikal, James E. Canning, *on the brief*), Cravath, Swaine & Moore LLP, New York, NY, *for Defendant-Movant International Business Machines Corporation.*

———

JOSÉ A. CABRANES, *Circuit Judge*:

2

This appeal presents the question of whether plaintiffs, victims of South African apartheid, have plausibly alleged relevant conduct committed within the United States that is sufficient to rebut the Alien Tort Statute's presumption against extraterritoriality.

We hold that they have not.

Accordingly, we **AFFIRM** the August 28, 2014 order of the United States District Court for the Southern District of New York (Shira A. Sheindlin, *Judge*).

## BACKGROUND

Nearly a decade and a half ago, plaintiffs filed suit under the Alien Tort Statute ("ATS")[1] against various corporations[2] for allegedly aiding and abetting crimes proscribed by "the law of nations" (also called "customary international law")[3] committed

---

[1] The ATS states in full: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

[2] Among the original defendants in this case were dozens of corporations, including many prominent multinational companies. Over time, however, the District Court granted many of these defendants' motions to dismiss, *see, e.g., In re S. African Apartheid Litig.*, 15 F. Supp. 3d 454, 455 (S.D.N.Y. 2014), and plaintiffs dropped their claims against many others in their subsequent amended complaints, *see, e.g., Balintulo v. Daimler AG*, 727 F.3d 174, 183 (2d Cir. 2013) ("*Balintulo I*"). Accordingly, the number of defendants has been whittled down to two: Ford Motor Co. ("Ford") and International Business Machines Corp. ("IBM").

[3] *See, e.g., Mastafa v. Chevron Corp.*, 770 F.3d 170, 176 (2d Cir. 2014) (equating violations of the law of nations with violations of customary

during apartheid by the South African government against South Africans within South Africa's sovereign territory.

The long and complicated procedural history of this consolidated case involves rulings from all three levels of the federal judiciary.[4] As relevant here, the District Court, on April 8, 2009, held that plaintiffs may proceed against defendants Ford and IBM (the "Companies") on an agency theory of liability for apartheid era crimes allegedly committed by their subsidiaries. Thereafter, the Companies sought a writ of mandamus in this Court. On September 17, 2010, while this case remained pending, we held, in *Kiobel v. Royal Dutch Petroleum Co.* ("*Kiobel I*"), that the ATS does not confer jurisdiction over claims pursuant to customary international law against corporations.[5] The Supreme Court granted certiorari and, on April 17, 2013, affirmed our judgment, while explicitly declining to

---

international law); *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 237 n.2 (2d Cir. 2003) ("In the context of the [ATS], we have consistently used the term 'customary international law' as a synonym for the term the 'law of nations.'"); *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (Scalia, *J.*, dissenting in part) (using the two terms interchangeably when noting that "'the law of nations,' or customary international law, includes limitations on a nation's exercise of its jurisdiction to prescribe").

[4] The factual and procedural history of the case—and the various separate cases that were consolidated to form the current action—is summarized in *In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 241–45 (S.D.N.Y. 2009), *Balintulo I*, 727 F.3d at 182–85, *In re South African Apartheid Litig.*, 15 F. Supp. 3d at 455–57, and *In re South African Apartheid Litig.*, 56 F. Supp. 3d 331, 332–36 (S.D.N.Y. 2014).

[5] 621 F.3d 111 (2d Cir. 2010).

4

reach the corporate liability question ("*Kiobel II*").[6] Instead, the Court held that "the presumption against extraterritoriality applies to claims under the ATS"[7] and thus the statute cannot be applied "to conduct in the territory of another sovereign."[8]

Two days after the Supreme Court released its ruling in *Kiobel II*, we requested supplemental briefing from the parties on the impact of that decision on the present case. Thereafter, on August 21, 2013, in *Balintulo v. Daimler AG*, 727 F.3d 174, 188 (2d Cir. 2013) ("*Balintulo I*"), we denied the Companies' request for a writ of mandamus and remanded to the District Court where the Companies would be able to "seek the dismissal of all of the plaintiffs' claims, and prevail, prior to discovery, through a motion for judgment on the pleadings." In so doing, we rejected plaintiffs' theory of vicarious liability for the Companies based on actions taken within South Africa by their South African subsidiaries and concluded that *Kiobel II* "forecloses the plaintiffs' claims because the plaintiffs have failed to allege that any relevant conduct occurred in the United States."[9]

On remand, the Companies moved for a judgment in their favor. The District Court ordered the Companies to brief the question of whether corporations can be held liable under the ATS

---

[6] *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct 1659, 1663 (2013).

[7] *Id.* at 1669.

[8] *Balintulo I*, 727 F.3d at 188.

[9] *Id.* at 189.

5

following *Kiobel II*. On April 17, 2014, the District Court held that the Supreme Court in *Kiobel II*, which, as noted earlier, expressly declined to address the question of corporate liability under customary international law, had nonetheless overruled the holding of *Kiobel I* and thus altered the law of the Circuit in that respect.[10] The District Court also permitted plaintiffs to move to amend their complaints in order to allege facts sufficient to overcome the ATS's presumption against extraterritoriality.[11] After plaintiffs submitted their proposed amended complaints, the District Court held that the proposed amendments were futile because the "relevant conduct" alleged "all occurred abroad" and because plaintiffs' theory of liability was foreclosed by this Court's decision in *Balintulo I*.[12]

## DISCUSSION

We generally review a district court's decision to permit or deny leave to amend a complaint for abuse of discretion, "keeping in mind that leave to amend should be freely granted when justice so requires."[13] However, when denial of leave to file a revised pleading is based on a legal interpretation, such as futility, a reviewing court conducts a *de novo* review.[14] A proposed amendment to a complaint

---

[10] *In re S. African Apartheid Litig.*, 15 F. Supp. 3d at 460.

[11] *Id.* at 465.

[12] *In re South African Apartheid Litig.*, 56 F. Supp. 3d at 338.

[13] *Pangburn v. Culbertson*, 200 F.3d 65, 70 (2d Cir. 1999) (internal quotation marks omitted).

[14] *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

is futile when it "could not withstand a motion to dismiss."[15] In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[16] And while a court must accept all of the allegations contained in a complaint as true, "that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[17]

## I. The ATS Claims

On appeal, plaintiffs claim that they have alleged extensive new facts demonstrating that the Companies' U.S.-based actions constituted unlawful aiding and abetting of crimes in violation of the law of nations. They allege that the Companies' "specialized product development, sales of such tailored products, and provision of expertise and training" were aimed at facilitating abuses committed in South Africa.[18] Specifically, plaintiffs allege that defendant Ford (1) provided specialized vehicles to the South African police and security forces to enable these forces to enforce apartheid,[19] and (2) shared information with the South African

---

[15] *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

[16] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[17] *Mastafa*, 770 F.3d at 177.

[18] Appellants' Br. 3.

[19] *Id*. at 15–21.

7

regime about anti-apartheid and union activists, thereby facilitating the suppression of anti-apartheid activity.[20] As for IBM, plaintiffs claim that the company (1) designed specific technologies that were essential for racial separation under apartheid and the denationalization of black South Africans;[21] (2) bid on, and executed, contracts in South Africa with unlawful purposes such as "denationalization"[22] of black South Africans;[23] and (3) provided training, support, and expertise to the South African government in using IBM's specialized technologies.[24]

In turn, the Companies assert that the District Court properly denied plaintiffs' motion for leave to amend their complaints because (1) plaintiffs cannot satisfy the ATS's territoriality and *mens rea* requirements; (2) corporations cannot be sued under the ATS; and (3) there is no aiding and abetting liability under the ATS.

## II. Jurisdiction Under the ATS

Our inquiry begins by assessing whether the ATS grants us jurisdiction over plaintiffs' action. The Alien Tort Statute contains numerous jurisdictional predicates, each of which must be satisfied

---

[20] *Id*. at 21–23.

[21] *Id*. at 12–13.

[22] By "denationalization," plaintiffs refer to the "stripp[ing] of . . . South African nationality and/or citizenship by South African security forces during the period from 1960 to 1994." J.A. 403.

[23] Appellants' Br. 11–12.

[24] *Id*. at 13.

before a court may properly assume jurisdiction over an ATS claim.[25] Thus, at the outset, a court must assure itself that: "(1) the complaint pleads a violation of the law of nations; (2) the presumption against the extraterritorial application of the ATS, announced by the Supreme Court in *Kiobel* [*II*], does not bar the claim; (3) customary international law recognizes [the asserted] liability [of a] defendant; and (4) the theory of liability alleged by plaintiffs (*i.e.*, aiding and abetting, conspiracy) is recognized by customary international law [or 'the law of nations']."[26] And while a defect in any of these jurisdictional predicates would be fatal to a plaintiff's claims, courts retain discretion regarding the order and manner in which they undertake these inquiries.[27]

Here, we begin by addressing the question of whether plaintiffs, in their proposed amended complaints, allege sufficient conduct to displace the ATS's presumption against extraterritoriality. Because we agree with the District Court's conclusion that they do not, we need not address the other jurisdictional predicates.[28]

---

[25] *Mastafa*, 770 F.3d at 179.

[26] *Id*. (internal citations omitted).

[27] *Id*.

[28] Though we dispose of plaintiffs' claims on other jurisdictional grounds, we note that plaintiffs fail to surmount another obstacle as well: they cannot establish jurisdiction under the ATS for claims against corporations. As previously discussed, the Supreme Court's decision in *Kiobel II* explicitly did not reach the corporate liability issue and did not modify the precedent of this

## A. ATS and the Presumption Against Extraterritoriality

As noted above, the Supreme Court in *Kiobel II* made clear that claims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign nation other than the United States.[29] The Court explained that it was dismissing the plaintiffs' claims because "all the relevant conduct took place outside the United States."[30] The wholly extraterritorial nature of the *Kiobel* plaintiffs' claims was "a dispositive fact" for the *Kiobel II* Court and so it had no reason to explore how courts should proceed where, as here, some of the "relevant conduct" occurred in the United States.[31]

---

Circuit that "corporate liability is not recognized as a 'specific, universal, and obligatory norm' . . . [and] is not a rule of customary international law that we may apply under the ATS." *Kiobel I*, 621 F.3d at 145 (internal citation omitted).

We need not delve deeply into the corporate liability question here to note the obvious error of the District Court in its holding that the Supreme Court in *Kiobel II* overturned our Court's holding in *Kiobel I. See In re South African Apartheid Litig.*, 15 F. Supp. 3d 454, 460–61 (S.D.N.Y. 2014). There is no authority for the proposition that when the Supreme Court affirms a judgment on a different ground than an appellate court it thereby overturns the holding that the Supreme Court has chosen not to address. To hold otherwise would undermine basic principles of *stare decisis* and institutional regularity.

[29] 133 S. Ct. at 1669.

[30] *Id.* at 1669.

[31] *Balintulo I*, 727 F.3d at 191.

In *Mastafa v. Chevron Corporation*, we applied the Supreme Court's rulings in *Morrison v. National Australia Bank Limited*[32] and *Kiobel II* to clarify that the "focus" of the ATS inquiry is on the nature and location of the conduct constituting the alleged offenses under the law of nations.[33] Accordingly, to determine whether specific claims can be brought under the ATS, a court must isolate the "relevant conduct" of a defendant—conduct that is alleged to be either a direct violation of the law of nations or the aiding and abetting of another's violation of the law of nations—in a complaint and then conduct a two-step jurisdictional analysis.

Step one is a determination of whether that "relevant conduct" sufficiently "touches and concerns" the United States so as to displace the presumption against extraterritoriality. Step two is a determination of whether that *same* conduct states a claim for a violation of the law of nations or aiding and abetting another's violation of the law of nations.[34]

In order to satisfy the second step of this analysis, a plaintiff stating a claim under an aiding and abetting theory must demonstrate that the defendant "'(1) provides practical assistance to the principal which has a substantial effect on the perpetration of the

---

[32] 561 U.S. 247 (2010) (after determining that the presumption against extraterritoriality applied to the Securities Exchange Act of 1934, the Court then determined which "territorial event[s]" or "relationship[s]" were the "focus" of the Act).

[33] *Mastafa*, 770 F.3d at 185-86.

[34] *Id.* at 186.

crime, and (2) does so with the purpose of facilitating the commission of that crime.'"[35] The *mens rea* standard for accessorial liability in ATS actions is "purpose rather than knowledge alone."[36] Knowledge of or complicity in the perpetration of a crime—without evidence that a defendant purposefully facilitated the commission of that crime—is thus insufficient to establish a claim of aiding and abetting liability under the ATS.[37]

## B. Analysis of Plaintiffs' Complaints

Turning to the complaints in the instant case, plaintiffs assert that the following conduct by defendant Ford is sufficient to displace the ATS's presumption against extraterritoriality: (1) Ford provided specialized vehicles to the South African security forces that enabled these forces to violently suppress opposition to

---

[35] *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (quoting and adopting the reasoning of Judge Katzmann's concurrence in *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 277 (2d Cir. 2007), which laid out the standard for a plaintiff to plead a theory of aiding and abetting liability under the ATS).

[36] *Id*. at 259.

[37] *Mastafa*, 770 F.3d at 192 ("Accordingly, the defendant's 'complicity' in the government's abuses in *Presbyterian Church*, without more, was insufficient to establish a claim of aiding and abetting or conspiracy under the ATS."); *Presbyterian Church*, 582 F.3d at 263 ("It is therefore not enough for plaintiffs to establish Talisman's complicity in depopulating areas in or around the Heglig and Unity camps: plaintiffs must establish that Talisman acted with the purpose to assist the Government's violations of customary international law.").

apartheid;[38] and (2) Ford was responsible for aiding and abetting the suppression of its own workforce in South Africa.[39]

As for IBM, plaintiffs allege that (1) IBM employees trained employees of the South African government on how to use their hardware and software to create identity documents—"the very means by which black South Africans were deprived of their South African nationality";[40] (2) IBM bid on contracts in South Africa with unlawful purposes such as denationalizing black South Africans;[41] and (3) IBM designed specific technologies that were essential for racial separation under apartheid and the denationalization of black South Africans.[42]

In *Balintulo I*, we reasoned that the Companies' alleged domestic conduct lacked a clear nexus to the human rights abuses occurring in South Africa.[43] Here too, plaintiffs' amended pleadings do not establish federal jurisdiction under the ATS because they do not plausibly allege that the Companies themselves engaged in any "relevant conduct" within the United States to overcome the presumption against extraterritorial application of the ATS.

---

[38] Appellants' Br. 36; *see also* J.A. 507, 513–17, 551.

[39] Appellants' Br. 37 n.16; *see also* J.A. 521–22.

[40] Appellants' Br. 35; *see also* J.A. 547.

[41] Appellants' Br. 34; *see also* J.A. 528, 534, 544, 546–48.

[42] Appellants' Br. 34–35; *see also* J.A. 535, 546–47.

[43] 727 F.3d at 192.

## 1. Allegations Against Ford

Beginning with the allegations against Ford, plaintiffs only allege "relevant conduct" that occurred in South Africa, thus failing to satisfy step one of *Mastafa*'s two-step jurisdictional analysis.[44] It was Ford's subsidiary in South Africa, not Ford, that is alleged to have assembled and sold the specialized vehicles to South Africa's government, with parts shipped principally from Canada and the United Kingdom—not from the United States.[45] Similarly, it was Ford's South African subsidiary, not Ford, that allegedly provided information to the apartheid government about anti-apartheid activists in South Africa.[46] Although plaintiffs repeatedly allege—no less than six times in their proposed amended complaint[47]—that Ford controlled their South African subsidiary, we have previously rejected a vicarious liability theory based on allegations materially identical to those asserted here.[48]

---

[44] *See Mastafa*, 770 F.3d at 186.

[45] J.A. 506–07, 514.

[46] J.A. at 519–21.

[47] J.A. at 455–68.

[48] *Balintulo I*, 727 F.3d at 192 (holding that because the complaint alleged only actions taken within South Africa by defendants' South African subsidiaries and because these "putative agents did not commit any relevant conduct within the United States giving rise to a violation of customary international law—that is, because the asserted violation[s] of the law of nations occurr[ed] outside the United States—the defendants cannot be *vicariously liable* for that conduct under the ATS" (internal quotation marks and citation omitted)).

Plaintiffs contend that their amended pleadings demonstrate that the Companies controlled their South African subsidiaries from the United States such that they could be found directly—and not just vicariously—liable for their subsidiaries' conduct under the ATS.  But holding Ford to be directly responsible for the actions of its South African subsidiary, as plaintiffs would have us do, would ignore well-settled principles of corporate law, which treat parent corporations and their subsidiaries as legally distinct entities.[49] While courts occasionally "pierce the corporate veil" and ignore a subsidiary's separate legal status, they will do so only in extraordinary circumstances, such as where the corporate parent excessively dominates its "subsidiary in such a way as to make it a 'mere instrumentality' of the parent."[50]

Here, plaintiffs present no plausible allegations—indeed, they present no allegations—that would form any basis for us to "pierce [Ford's] corporate veil."[51] The complaints do not suggest that Ford's control over its subsidiaries differed from that of most companies headquartered in the United States with subsidiaries abroad. Allegations of general corporate supervision are insufficient to rebut

---

[49] *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("Generally speaking, a parent corporation and its subsidiary are regarded as legally distinct entities.").

[50] *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014).

[51] *Id*.

the presumption against territoriality and establish aiding and abetting liability under the ATS.

## 2. Allegations Against IBM

Plaintiffs' first allegation against IBM also fails because the "relevant conduct" all occurred within South Africa and so they cannot satisfy step one of *Mastafa*'s two-step jurisdictional analysis.[52] Just as in the case of Ford, it is IBM's South African subsidiary—not IBM—that is alleged to have trained South African government employees to use IBM hardware and software to create identity materials.[53] These allegations cannot rebut the presumption against extraterritoriality as they do not sufficiently "tie[ ] the relevant human rights violations to actions taken within the United States."[54]

Plaintiffs' second allegation against IBM—that the company bid on contracts meant to further the denationalization of South African blacks—falls short of alleging a violation of the law of nations for a simple reason: IBM did not win the contract for the only bid specifically alleged to have been made by IBM, rather than IBM's South African subsidiary.[55] Indeed, even according to plaintiffs, another company, ICL, won the passbooks contract over

---

[52] *See Mastafa*, 770 F.3d at 186.

[53] J.A. 547; *see also* J.A. 446.

[54] *Balintulo I*, 727 F.3d at 192.

[55] J.A. 528

16

IBM.[56] It is simply not a violation of the law of nations to bid on, and lose, a contract that arguably would help a sovereign government perpetrate an asserted violation of the law of nations.

Plaintiffs final allegation against IBM, on the other hand, appears to "touch and concern" the United States with sufficient force to displace the presumption against extraterritoriality. Their proposed amended complaint reads, in relevant part, as follows:

> In the United States, IBM developed both the hardware and the software—both a machine and a program—to create the Bophuthatswana ID. Once IBM had developed the system, it was transferred to the Bophuthatswana government for implementation.[57]

Identity documents, like those allegedly created by IBM and transferred to the Bophuthatswana government, were an essential component of the system of racial separation in South Africa.[58] And

---

[56] J.A. at 169–70, 258.

[57] J.A. at 546.

[58] Appellant's Br. 8–9. Bophuthatswana was a Bantustan, a territory set aside by the South African government for particular ethnic groups. *Id*. Given the outcome of our analysis, we need not reach the question of whether plaintiffs' allegations regarding racial separation systems in South Africa constitute a violation of the law of nations. *Cf. Mastafa*, 770 F.3d at 181 (undertaking that analysis in the context of crimes allegedly committed by the Saddam Hussein regime). Of course, whether a violation of the law of nations has indeed occurred is an independent jurisdictional predicate, *see* infra n.27 and accompanying text,

so, designing particular technologies in the United States that would facilitate South African racial separation would appear to be both "specific and domestic"[59] conduct that would satisfy the first of the two steps of our jurisdictional analysis.[60] Accordingly, if this allegation is able to also satisfy the second prong of our extraterritoriality inquiry—that is, if such conduct aided and abetted a violation of the law of nations—the presumption against extraterritoriality would be displaced and we would be able to establish jurisdiction for this particular claim under the ATS.

Upon an initial review of the "relevant conduct" in the complaint, however, we conclude that plaintiffs' claim against IBM does not meet the *mens rea* requirement for aiding and abetting liability established by our Court. While the complaint must "support [] an inference that [IBM] acted with the 'purpose' to advance [South Africa's] human rights abuses,"[61] it plausibly alleges, at most, that the company acted with knowledge that its acts might facilitate the South African government's apartheid policies. But, as we noted earlier, mere knowledge without proof of purpose is

and one inextricably intertwined with the extraterritoriality analysis that we conduct here.

[59] *Mastafa*, 770 F.3d at 191.

[60] *See* supra II.A.; *see also Mastafa*, 770 F.3d at 191 (finding multiple domestic purchases and financing transactions by one defendant and numerous domestic payments and "financing arrangements" by another defendant to be sufficiently "specific and domestic" to satisfy the first prong of the jurisdictional analysis).

[61] *Presbyterian Church*, 582 F.3d at 260.

insufficient to make out the proper *mens rea* for aiding and abetting liability.[62]

Moreover, where the language in the complaint seems to suggest that IBM acted purposefully,[63] "it does so in conclusory terms and fails to establish even a baseline degree of plausibility of plaintiffs' claims."[64] A complaint will not "suffice if it tenders naked assertions devoid of further factual enhancement."[65] Indeed, plaintiffs do not—and cannot—plausibly allege that by developing hardware and software to collect innocuous population data, IBM's purpose was to denationalize black South Africans and further the aims of a brutal regime.[66] This absence of a connection between IBM's "relevant conduct" and the alleged human rights abuses of the South African government means that plaintiffs, even if allowed

---

[62] *See Mastafa*, 770 F.3d at 192–94.

[63]  *See*, *e.g.*, J.A. 534.

[64] *Mastafa*, 770 F.3d at 194.

[65] *Iqbal*, 556 U.S. at 678 (quotation marks, brackets, and citation omitted).

[66] *See Mastafa*, 770 F.3d at 194 ("Plaintiffs never elaborate upon [a similarly conclusory] assertion in any way that establishes the plausibility of a large international corporation intending—and taking deliberate steps with the purpose of assisting—the Saddam Hussein regime's torture and abuse of Iraqi persons."); *see also Kiobel*, 621 F.3d at 192 (Leval, *J.*, concurring in the judgment) ("[The complaint] pleads also in conclusory form that the Nigerian military's campaign of violence against the [victim-plaintiffs] was 'instigated, planned, facilitated, conspired and cooperated in' by [defendant corporation]. Such pleadings are merely a conclusory accusation of violation of a legal standard and do not withstand the test of *Twombly* and *Iqbal*.").

to amend their complaint, will be unable to state a valid ATS claim against IBM.

Accordingly, because plaintiffs fail plausibly to plead that any U.S.-based conduct on the part of either Ford or IBM aided and abetted South Africa's asserted violations of the law of nations, their claims cannot form the basis of our jurisdiction under the ATS. We therefore affirm the District Court's denial of plaintiffs' motion for leave to file an amended complaint because the proposed amendments are futile as a matter of law.

## CONCLUSION

To summarize, we hold that:

(1) Knowledge of or complicity in the perpetration of a crime under the law of nations (customary international law)—absent evidence that a defendant purposefully facilitated the commission of that crime—is insufficient to establish a claim of aiding and abetting liability under the ATS.

(2) It is not a violation of the law of nations to bid on, and lose, a contract that arguably would help a sovereign government perpetrate an asserted violation of the law of nations.

(3) Allegations of general corporate supervision are insufficient to rebut the presumption against extraterritoriality and establish aiding and abetting liability under the ATS.

20

(4) Here, plaintiffs' amended pleadings do not establish federal jurisdiction under the ATS because they do not plausibly allege that the Companies themselves engaged in any "relevant conduct" within the United States to overcome the presumption against extraterritorial application of the ATS.

    a. Holding Ford to be directly responsible for the actions of its South African subsidiary, as plaintiffs would have us do, ignores well-settled principles of corporate law, which treat parent corporations and their subsidiaries as legally distinct entities.

    b. Plaintiffs have plausibly alleged some specific, domestic conduct in the complaint—namely, that IBM in the United States designed particular technologies in the United States that facilitated South African apartheid. This conduct satisfies the first prong of our extraterritoriality analysis as it "touches and concerns" the United States.

    c. Plaintiffs' complaint against IBM fails on the second prong of the required jurisdictional analysis: it does not plausibly allege that IBM's conduct purposefully aided and abetted South Africa's alleged violations of customary international law.

d. Accordingly, the alleged conduct cannot state a claim for aiding and abetting liability under the ATS and cannot form the basis for our jurisdiction.

(5) Because we decide the case on the basis of the presumption against extraterritoriality, we need not address whether plaintiffs' complaint satisfies the ATS's other jurisdictional predicates, including whether the complaint pleads a violation of the law of nations; whether customary international law recognizes the asserted liability of the Companies; and whether the theory of liability alleged by plaintiffs is recognized by customary international law.

For the reasons set forth above, we **AFFIRM** the August 28, 2014 order of the District Court.