23-561-cv
*Eddystone Rail Company, LLC v. Bank of America, N.A., et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by federal rule of appellate procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the federal appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 8th day of July, two thousand twenty-four.

PRESENT:
> BARRINGTON D. PARKER,
> GERARD E. LYNCH,
> MARIA ARAÚJO KAHN,
> *Circuit Judges.*

———————————————————————

EDDYSTONE RAIL COMPANY, LLC,

> *Plaintiff-Appellant,*

v.                                                                              23-561-cv

BANK OF AMERICA, N.A., CAPITAL ONE, N.A., FIFTH THIRD BANK, JPMORGAN CHASE BANK, N.A., WELLS FARGO BANK, N.A., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., SUNTRUST BANK, BMO HARRIS BANK, N.A., CIBC BANK USA, FKA PRIVATEBANK & TRUST COMPANY, U.S. BANK NATIONAL ASSOCIATION, TPG SPECIALTY

LENDING, INC., PNC BANK, NAT'L ASSOC., TAO
TALENTS, LLC, PONTUS HOLDINGS, LTD.,

*Defendants-Appellees.*

---

FOR PLAINTIFF-APPELLANT:

DANIEL H. TABAK (Stephen M. Sinaiko, Marvin J. Lowenthal, & Benjamin Zhu, *on the brief*), Cohen & Gresser, LLP, New York, NY.

FOR DEFENDANTS-APPELLEES BANK OF AMERICA, N.A., CAPITAL ONE, N.A., FIFTH THIRD BANK, JPMORGAN CHASE BANK, N.A., WELLS FARGO BANK, N.A., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., SUNTRUST BANK, BMO HARRIS BANK, N.A., CIBC BANK USA, FKA THE PRIVATEBANK & TRUST COMPANY, U.S. BANK NATIONAL ASSOCIATION, AND PNC BANK, NAT'L ASSOC.:

LARA SAMET BUCHWALD (Chui-Lai Cheung, *on the brief*), Davis Polk & Wardwell LLP, New York, NY.

FOR DEFENDANTS-APPELLEES TPG SPECIALTY LENDING, INC., PNC BANK, NAT'L ASSOC., TAO TALENTS, LLC, PONTUS HOLDINGS, LTD.:

ROBERT J. WARD (Michael L. Cook, Frank W. Olander, Christiana G. Johnson, *on the brief*), Schulte Roth & Zabel LLP, New York, NY.

Appeal from judgments of the United States District Court for the Southern District of New York (George B. Daniels, *J.*).

2

Upon due consideration, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the August 27, 2020, September 28, 2021, and March 13, 2023, judgments of the district court are **AFFIRMED IN PART** and **REVERSED** and **REMANDED IN PART** for further proceedings consistent with this order.

Plaintiff-Appellant Eddystone Rail Company, LLC ("Eddystone") appeals from a judgment of the district court dismissing its fraudulent conveyance claims against third-party creditors arising from its multi-year effort to recover more than $140 million from nonparty Bridger Transfer Services, LLC ("BTS"), an oil transportation and logistics company that allegedly reneged on a contract with Eddystone. In 2013, Eddystone entered into a five-year Rail Services Agreement (the "RSA") with BTS pursuant to which BTS was obligated to transfer a monthly volume of crude oil or pay a deficiency fee. In June 2015, BTS's parent company, Bridger Logistics, LLC ("Bridger Logistics"), and its subsidiaries were acquired by Ferrellgas, L.P. and Ferrellgas Partners, L.P. (collectively, "FGP"). Eddystone alleges that shortly thereafter, FGP transferred BTS's assets to other affiliated entities to render it judgment-proof, causing BTS to default on its obligations under the RSA in February 2016. FGP then sold BTS for $10.[1]

---

[1] In April 2016, Eddystone initiated an arbitration against BTS for breach of the RSA. The parties reached a settlement of $140 million against BTS, and in February 2017, Eddystone filed a

3

In 2009, before it acquired BTS, FGP entered into a credit agreement with a group of lenders (the "BofA Credit Agreement"). During the relevant period, the lenders included Bank of America, N.A. ("BofA"), which acted as the group's administrative agent, and ten other banks (collectively, the "BofA Lenders"), including The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("MUFG").[2] In 2018, the BofA Credit Agreement was replaced by a similar credit agreement (the "TPG Credit Agreement") with, *inter alia*, TPG Specialty Lending, Inc. ("TPG") as the administrative agent and other banks (collectively, the "TPG Lenders"), including Pontus Holdings, Ltd. ("Pontus"), a Bermudan corporation.[3] The BofA Lenders and the TPG Lenders are, collectively, the

---

petition in the United States District Court for the Southern District of New York to confirm the award. *See Eddystone Rail Co. v. Jamex Transfer Services, LLC*, No. 17-cv-1266 (JMF) (S.D.N.Y. 2017). That litigation is currently stayed.

On February 2, 2017, unable to collect from BTS, Eddystone filed suit against FGP and multiple BTS affiliates in the United States District Court for the Eastern District of Pennsylvania ("Pennsylvania litigation"), *see Eddystone Rail Co. v. Bridger Logistics, LLC*, No. 2:17-cv-0495 (JDW) (E.D. Pa. 2017), alleging that FGP and its affiliates fraudulently transferred away BTS's assets, thereby preventing BTS from satisfying the arbitration award. A decision in that case is pending, following a bench trial.

[2] The BofA Lenders include BofA; Capital One, N.A.; Fifth Third Bank; JPMorgan Chase Bank, N.A.; Wells Fargo Bank, N.A.; The Bank of Tokyo-Mitsubishi UFJ, Ltd.; SunTrust Bank; PNC Bank, Nat'l Assoc.; BMO Harris Bank, N.A.; CIBC Bank USA; and U.S. Bank National Association.

[3] The TPG lenders include TPG; PNC Bank, Nat'l Assoc. (an Edge Act bank); TAO Talents, LLC; and Pontus Holdings, Ltd.

4

"Defendants" in the present appeal.

In June 2019, Eddystone filed the instant complaint (the "Complaint") against Defendants in the New York State Supreme Court, County of New York alleging that Defendants were recipients of fraudulent conveyances of BTS assets by FGP, pursuant to the New York Debtor and Creditor Law ("DCL")[4] Sections 273 and 278.[5]   In October 2019, Defendants removed the action to the United States District Court for the Southern District of New York.   Eddystone moved to remand the case to the Supreme Court of the State of New York, which the district court denied in August 2020.  *Eddystone Rail Co., LLC v. Bank of Am., N.A.*, 482 F. Supp. 3d 123 (S.D.N.Y. 2020).   Defendants then moved to dismiss the Complaint for failure to state a claim, which the district court granted on September 28, 2021.  *Eddystone Rail Co. v. Bank of Am., N.A.*, No. 19-cv-9584 (GBD), 2021 WL 4443371 (S.D.N.Y. Sept. 28, 2021) (hereinafter "2021 Order").   Subsequently, on April 15, 2022, Eddystone moved for leave to file an amended complaint ("Proposed Amended

---

[4] The relevant sections of the DCL "have been repealed and replaced—effective April 4, 2020—by an act of the New York legislature approved on December 6, 2019."  *Ray v. Ray*, 799 F. App'x 29, 31 n.1 (2d Cir. 2020) (summary order) (citing 2019 N.Y. Sess. Laws Ch. 580 (McKinney)). The new provisions, however, do "'not apply to a transfer made or obligation incurred before' the act's effective date, 'nor shall [they] apply to a right of action that has accrued before [that] effective date.'"  *Id*. (quoting 2019 N.Y. Sess. Laws Ch. 580 (McKinney)).   Therefore, all references to the DCL refer to the DCL as it existed before the 2020 amendments.

[5] The Complaint did not clearly state the legal basis for Eddystone's claims.   The district court construed the Complaint as bringing claims under the DCL, and no party disagrees.

Complaint" or "PAC"), which the district court denied in March 2023. *Eddystone Rail Co. v. Bank of Am., N.A.*, No. 19-cv-9584 (GBD), 2023 WL 2507059 (S.D.N.Y. Mar. 13, 2023) (hereinafter "2023 Order"). This appeal followed. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision.

## DISCUSSION

### I.    Denial of the Motion to Remand

First, Eddystone challenges the district court's denial of its motion to remand based on the court's determination that it had jurisdiction over this matter pursuant to the Edge Act, 12 U.S.C. § 632. "We review a district court's denial of a motion to remand *de novo*." *O'Donnell v. AXA Equitable Life Ins. Co.*, 887 F.3d 124, 128 (2d Cir. 2018).

To remove a case to federal court under the Edge Act, an action must: (1) be a civil suit, (2) have a federally chartered corporation, a so-called "Edge Act bank," as a party, and (3) as relevant here, arise "out of transactions involving international or foreign banking." *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 780–81 (2d Cir. 2013) (quoting 12 U.S.C. § 632 in the last instance). The parties agree that the first two elements are satisfied but dispute whether the relevant transactions involved "international or foreign" banking. We conclude that they did, and the district court therefore had

6

jurisdiction over this matter under the Edge Act.

In *Kirschner v. JP Morgan Chase Bank, N.A.*, we held that the "international or foreign" banking element was satisfied where an Edge Act bank "directly assigned a portion of its interest in [a] [t]erm [l]oan to *foreign* lenders." 79 F.4th 290, 302 (2d Cir. 2023). Although most of the other lenders involved in that transaction were domestic entities, we concluded that the "international or foreign" requirement was sufficiently met when an Edge Act bank directly assigned a loan to one or more foreign entities. *See id.* at 303. Under *Kirschner*, the banking transactions here squarely qualify as "international or foreign." The transactions in this case include the BofA and TPG Credit Agreements, including payments made from FGP under the agreements to the lenders. Those transactions involved at least two Edge Act banks, BofA and PNC Bank, National Association ("PNC"), and foreign lenders, including MUFG and Pontus. BofA and TPG, as administrators of their respective credit agreements, received repayments from FGP and distributed those repayments to the lenders, including the foreign entities, based on their respective portions under the credit agreements. Therefore, similar to the transaction in *Kirschner*, an Edge Act bank here (BofA) directly distributed repayments to a foreign entity (MUFG). *See id*. at 302–03.

The facts are slightly different for the TPG Lenders, because the Edge Act bank

there (PNC) was not the administrative agent that distributed repayments to lenders but was rather another lender that *received* repayments along with a foreign lender (Pontus). We need not decide, however, whether the TPG Credit Agreement is sufficiently "international or foreign" because the BofA Credit Agreement satisfies the requirements of Edge Act jurisdiction. If a civil suit to which an Edge Act bank is a party arises out of transactions involving international or foreign banking, "*any* defendant in any such suit may . . . remove *such suits* from a State court into the district court of the United States." 12 U.S.C. § 632 (emphases added). Thus, because Eddystone filed the instant action against both the BofA and TPG Lenders, and there is Edge Act jurisdiction over the BofA Lenders, this entire suit, including the claim against the TPG Lenders, can be removed to federal court.

Although Eddystone argues that there is no Edge Act jurisdiction when the transactions at issue involve purely domestic activities, we have previously rejected similar arguments and have held that the "international or foreign" banking element is met when an Edge Act bank engages in a qualifying transaction with a foreign entity under § 632. *See Kirschner*, 79 F.4th at 302 (rejecting claim that the "mere fortuitous involvement of the foreign lenders in an otherwise domestic transaction is alone insufficient to trigger the [international or foreign banking] element" (internal quotation

8

marks omitted)); *see also Wilson v. Dantas*, 746 F.3d 530, 534–35 (2d Cir. 2014) (holding that Edge Act jurisdiction existed over breach of fiduciary duty and contract claims arising out of work done by a domestic individual as part of an international investment program involving an Edge Act bank); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 792 (2d Cir. 1980) (holding that Edge Act jurisdiction existed because an Edge Act bank provided a letter of credit allowing for domestic corporations in New York to draw on the account of a foreign corporation); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 826 F. App'x 115, 117 (2d Cir. 2020) (summary order) (holding that Edge Act jurisdiction existed where the Edge Act bank "entered into a set of complex financial relationships" involving a foreign entity). Thus, the district court did not err in concluding that federal jurisdiction exists under the Edge Act and denying Eddystone's motion to remand.

## II.    Denial of the Motion to Amend the Complaint[6]

Next, we turn to Eddystone's challenges to the district court's denial of its motion

---

[6] We need not separately review the district court's prior decision dismissing the Complaint because the PAC includes additional detailed allegations beyond the Complaint. Therefore, whether Eddystone has stated a claim turns on the PAC. In other words, if the PAC is futile because it fails to state a claim, it follows that the Complaint likewise failed to state a claim. If the PAC does state a claim, we need not consider whether the initial Complaint was sufficient because the PAC would suffice on its own. Thus, we only consider the PAC in our review.

9

to amend.    We conduct *de novo* review when "denial of leave to file a revised pleading is based on a legal interpretation, such as futility."    *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164 (2d Cir. 2015).    To the extent, however, that the denial of a motion to replead was based on undue delay and prejudice, we review for abuse of discretion, "keeping in mind that leave to amend should be freely granted when justice so requires."    *See id.* (internal quotation marks omitted).

We first review the district court's determination that amendment would be futile under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim.    Under the DCL, "a conveyance by a debtor is deemed constructively fraudulent if it is made without 'fair consideration,' and . . . the transferor is insolvent or will be rendered insolvent by the transfer in question."    *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005) (citing DCL § 273).    The DCL further provides that "[w]here a conveyance or obligation is fraudulent as to a creditor, such creditor . . . may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase . . . [h]ave the conveyance set aside."    DCL § 278(1)(a) (2019).

As to the TPG Lenders, Eddystone alleges in the PAC that in July 2018, Bridger Terminals, LLC ("Bridger Terminals"), a BTS subsidiary, sold its and its subsidiaries' remaining assets, including Swan Ranch Terminal, and that according to FGP's Securities

10

and Exchange Commission ("SEC") filings, FGP used $32.8 million of those proceeds to pay back the TPG Lenders. J. App'x 947. Eddystone also alleges that the sale of Swan Ranch Terminal alone generated over $8 million in proceeds and that the proceeds were transferred entirely and immediately to FGP. *Id.* at 951. Eddystone alleges that Bridger Terminals and its subsidiaries, including Bridger Swan Ranch, LLC ("Bridger Swan Ranch"), were "created almost simultaneously with the diversion of more than $40 million in fixed assets from BTS," which included the Station Throughput Revenue, in January 2016. *Id.* at 947, 949. As further support, Exhibit C illustrates how Station Throughput Revenue attributed to BTS was directed to Bridger Terminals and Bridger Swan Ranch starting in February 2016. *Id.* at 956. The district court provided two reasons for why it believed that these allegations were insufficient. The first was that there was an unexplained gap of over two years between the allegedly fraudulent transfers involving Swan Ranch Terminal in January 2016 and the payment to the TPG Lenders. 2023 Order at *5. We are not persuaded that a gap of this length, on its own, is determinative of plausibility. Notably, the district court itself took no issue with this gap in its prior decision, stating that "[c]ontrary to the [TPG] Lenders' contention, a 30-month gap between transfers does not present an issue to proceeds that can be plausibly traced to fraudulently transferred property." 2021 Order at *6 n.9. The second reason

11

the district court provided is that the allegation that the $32.8 million paid to the TPG Lenders came from the sale of BTS assets was "conclusory." 2023 Order at *5. While it is certainly possible that discovery may ultimately reveal that the $32.8 million was not derived from former BTS assets, that does not mean that this allegation is conclusory. To the contrary, Eddystone alleges that there was a specific set of sales in 2018 of assets that originated with BTS and that from these sales, $32.8 million was allegedly used by FGP to pay back the TPG Defendants. Eddystone also specifically alleges that none of FGP's SEC filings indicate that Bridger Terminals or its subsidiaries had acquired any additional assets after receiving the transfer of BTS assets since January 2016 when these entities were formed, *see* J. App'x 939, 947, further supporting the claim that the $32.8 million that FGP paid to the TPG Lenders could have derived from BTS assets. Accordingly, the allegations against the TPG Defendants cross "the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and the district court should therefore not have dismissed Eddystone's claim against them.

As to the BofA Lenders, we also conclude that Eddystone's proposed amendment does not fail to state a claim. In the PAC, Eddystone alleges in detail that soon after FGP purchased Bridger Logistics and its subsidiaries, it redirected BTS's three main sources of revenue through affiliated entities to Bridger Logistics and rendered BTS penniless. J.

12

App'x 948-49.   Then, Eddystone alleges, Bridger Logistics transferred the funds from these revenue streams to FGP on a regular basis, and FGP made monthly payments to the BofA Lenders from the same account into which Bridger Logistics had transferred the funds.   J. App'x 949.   The PAC attaches several charts describing these allegedly fraudulent transfers, including Exhibit F which specifically details when Bridger Logistics transferred funds to FGP and when FGP transferred funds to the BofA Lenders, which are regular, repeating transactions that are close in time to each other.   *See* J. App'x at 960–61.   For these reasons, we conclude that the PAC states a plausible claim for relief against the BofA Lenders.

There remains a separate question of whether the district court erred in denying leave to amend on the basis that there was undue delay and that amendment would prejudice Defendants.   We conclude that the district court's ruling exceeded its discretion.   The district court determined that there was undue delay because Eddystone failed to provide a satisfactory explanation for its three-year delay in amending the Complaint.   But there was not really a "three-year delay," as the district court dismissed the original Complaint in September 2021, and Eddystone moved for leave to file the PAC seven months later in April 2022.   We have held that "[w]ithout the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the

13

practicality and possible means of curing specific deficiencies." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Thus, Eddystone cannot be penalized for waiting until it received the district court's decision granting the motions to dismiss before determining what it needed to do to amend its Complaint, including modifying the protective order in the Pennsylvania litigation.

Finally, the district court stated that permitting Eddystone to file an amended complaint would prejudice Defendants but failed to explain what the prejudice would be. Absent such an explanation, we cannot conclude that the district court acted within its discretion in denying the motion to amend on the basis of prejudice. Accordingly, the district court exceeded its discretion in denying the motion to amend for reasons of undue delay and prejudice to Defendants.

\*     \*     \*

14

We have reviewed the parties' other arguments and find them to be either without merit or unavailing. For the foregoing reasons, we **AFFIRM** the district court's denial of Eddystone's motion to remand and **REVERSE** and **REMAND** the denial of leave to amend as to the BofA and TPG Lenders for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

15